# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

| | |
|---|---|
| ELENA BEN DAVID,<br><br>       Plaintiff,<br><br>v.<br><br>BRIAN R. MOUSHEGIAN, in his official capacity as General Counsel of the Attorney Discipline Office of the New Hampshire Supreme Court, MARK P. CORNELL, in his official capacity as Deputy General Counsel of the Attorney Discipline Office of the New Hampshire Supreme Court, ANDREA Q. LABONTE, in her official capacity as Assistant General Counsel of the Attorney Discipline Office of the New Hampshire Supreme Court, SARA S. GREENE, in her official capacity as Disciplinary Counsel of the Attorney Discipline Office of the New Hampshire Supreme Court, ELIZABETH M. MURPHY, in her official capacity as Assistant Disciplinary Counsel of the Attorney Discipline Office of the New Hampshire Supreme Court, ANTHONY J. NARO, in his official capacity as a member of the Hearings Committee appointed to the Hearing Panel in Attorney Discipline Office, No. 23-013, ELAINE HOLDEN, in her official capacity as a member of the Hearings Committee appointed to the Hearing Panel in Attorney Discipline Office, No. 23-013, HON. PETER H. FAUVER, in his official capacity as the member of the Hearings Committee appointed as the Hearing Panel Chair in Attorney Discipline Office, No. 23-013, BROOKSLEY C. BELANGER, in her official capacity as Chair of the Hearings Committee appointed to the Hearing Panel in Attorney Discipline Office, No. 23-013, SUSAN CHOLLET, in her official capacity as a member of the Hearings Committee appointed to the Hearing Panel in Attorney Discipline Office, No. 23-013, STEPHANIE C. HAUSMAN, in her official capacity as Chair of the Professional Conduct Committee of the New Hampshire Supreme Court, CAROLINE K. LEONARD, in her official capacity as Vice Chair of the Professional Conduct Committee of the New Hampshire Supreme Court, KATHLEEN M. AMES, in her official capacity as Vice Chair of the Professional Conduct Committee of the New Hampshire Supreme Court, RONALD K. ACE, in his official capacity as a Member of the Professional Conduct Committee of the New Hampshire Supreme Court, RICHARD C. GAGLIUSO, in his official capacity as a Member of the Professional Conduct Committee of the New Hampshire Supreme Court, EVERETT S. GRASS, in his official capacity as a Member of the Professional Conduct Committee of the New Hampshire Supreme Court, PETER J. KIRIAKOUTSOS, in his official capacity as a Member of the Professional Conduct Committee of the New Hampshire Supreme Court, ROBERT R. LUCIC, in his official capacity as a Member of  the Professional Conduct Committee of the New | CIVIL ACTION NO.: 1:25-CV-00278-JL-AJ<br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br><br>**VERIFIED AMENDED – CORRECTED COMPLAINT** |

Hampshire Supreme Court, KARYL R. MARTIN, in her official capacity as a Member of the Professional Conduct Committee of the New Hampshire Supreme Court, ROBIN D. MELONE, in her official capacity as a Member of the Professional Conduct Committee of the New Hampshire Supreme Court, MITCHEL M. SIMON, in his official capacity as a Member of the Professional Conduct Committee of the New Hampshire Supreme Court, and ERIC R. WILSON, in his official capacity as a Member of the Professional Conduct Committee of the New Hampshire Supreme Court,

Defendants.

## **INTRODUCTION**

1.    This case arises out of the threatened application of New Hampshire Rule of Professional Conduct 4.4(a) against Assistant Hillsborough County Attorney Elena Ben David ("Plaintiff").[1]  Rule 4.4(a) fails to pass constitutional muster under the Due Process Clause of the Fourteenth Amendment, the First Amendment both on its face and as it is being applied to Plaintiff by the State's Attorney Discipline Office (the "ADO") because it subjects attorneys to state-imposed penalties using a standard that is impermissibly vague and overbroad and is therefore subject to arbitrary and discriminatory application and enforcement.

2.    The ADO filed a Notice of Charges against Plaintiff based on three truthful statements she made as the state prosecutor during a Superior Court hearing in an arson prosecution.  Plaintiff made the statements in direct response to the defendant's counsel's repeated, yet demonstrably false, allegations of conduct effectively amounting to prosecutorial misconduct and his insistence that the Superior Court sanction her. The court-appointed private defense counsel's ("Attorney Doe")[2] attack

---

[1] Plaintiff married in 2024 and changed her surname from "Brander" to "Ben David."  She is referenced in the attached exhibits and during most of the events leading to this action as Elena Brander.

[2] Opposing counsel is not mentioned by name in this Verified Amended Complaint because he has claimed that Plaintiff's statements during the Superior Court hearing embarrassed him.

on Plaintiff's ethics occurred only after she declined to accept his proposed plea agreement requesting a no-jail disposition.

3.    The crux of Attorney Doe's prosecutorial misconduct claim was that Plaintiff had failed to timely provide police body-worn camera video evidence (the "BWC Video Evidence") to him in discovery.[3]  For reasons that remain unclear, in a three-day period, Attorney Doe filed two motions to compel discovery of the BWC Video Evidence and requests for monetary sanctions.

4.    Despite such aggressive tactics, Attorney Doe ultimately conceded that he received the BWC Video Evidence and downloaded it to his computer at the outset of the case. In addition, he was forced to acknowledge that he had received a second "courtesy" copy of the BWC Video Evidence within one business day of his request for another discovery link. Plaintiff thus twice produced the BWC Video Evidence to Attorney Doe on a timely basis *before* he filed the back-to-back motions seeking sanctions within a period of three days.

5.    At the hearing on the motions, the principal disputed factual issue quickly became whether Attorney Doe had timely received the BWC Video Evidence. Attorney Doe claimed he did not receive the BWC Video Evidence until *after* he had filed his motions. Offering no documentary proof to support that claim, Attorney Doe relied solely on his own statements as a participant with personal knowledge of the events. Plaintiff maintained that Attorney Doe downloaded the BWC Video Evidence to his computer at the beginning of the case.  She further argued that she provided Attorney Doe with a second copy of the evidence *before* he filed his first motion.[4] To support her position, Plaintiff presented documentary evidence from the Hillsboro Police Department ("HPD")

---

[3] The BWC Video Evidence consisted of three separate video files and a Table of Contents.

[4] By the time of the hearing, Plaintiff had provided Attorney Doe with a total of four copies of the Video. Attorney Doe received two copies *before* he filed the motions and an additional two copies after he filed the motions.

setting forth the dates on which it had sent discovery links to Attorney Doe, including the date on which he had downloaded the BWC Video Evidence. Like Attorney Doe, Plaintiff was also a witness to the events and offered her firsthand account of the State's production of the discovery.

6.    By filing the motions to compel, Attorney Doe placed his own credibility in issue. The Superior Court was called on to determine: (1) whether Attorney Doe had given a truthful account as to *when* he had received the BWC Video Evidence; and (2) whether Attorney Doe had a good faith basis to accuse Plaintiff of discovery misconduct and to make the extraordinary sanctions requests.

7.    Before the hearing, Attorney Doe labeled Plaintiff a "passive-aggressive obstructionist" in his second motion to compel. At the hearing, Attorney Doe continued to accuse her of engaging in misconduct, accusing her of "juvenile sniping," and discovery obstruction because Plaintiff had insisted that he direct his discovery-related e-mails only to her and not to her Assistant or the police. During the hearing, Attorney Doe tried to trade on his experience as a former police officer and prosecutor to suggest the Superior Court should rely on his version of the facts, as opposed to Plaintiff's account.

8.    It was in this context that Plaintiff sought to discredit Attorney Doe's representations to the Superior Court by rebutting his assertion of his own good character. Regarding his accusation that she obstructed discovery by insisting that she wanted discovery requests to be sent to her only, Plaintiff informed the Superior Court that she did not want Attorney Doe to contact her Assistant because he previously had reduced an Assistant in her office to tears.

9.    Concerning Attorney Doe's effort to bolster his own credibility by touting his credentials as a former police officer and prosecutor, Plaintiff asked the Superior Court if it was aware of the circumstances leading to Attorney Doe's departure from the Hillsborough County Attorney's Office (the "HCAO"). Plaintiff asked this question, but she did not elaborate by answering it. At that time, a simple Google search revealed publicly available information describing Attorney Doe's resignation

as a prosecutor pursuant to his agreement with the State to never again serve as a prosecutor or police officer in the State of New Hampshire.

10.   Finally, Plaintiff made a truthful comment in response to Attorney Doe's convoluted and evasive responses to the Superior Court's questions about *whether he received* the BWC Video Evidence and, if so, *when* he received the evidence. She informed the Superior Court that Attorney Doe had a history and practice of mismanagement, even with respect to clients to whom he owed a fiduciary duty, in contrast to the duties he owed to the State and the Superior Court. Specifically, Attorney Doe was involved in client trust account mismanagement, which may explain how he misplaced the BWC Video Evidence that had been emailed to him twice. It is these statements to the Superior Court that the ADO alleges violated N.H. R. Prof. Cond. 4.4(a) because they had the "primary purpose to embarrass" Attorney Doe.  The Superior Court denied Attorney Doe's motions to compel and requests for sanctions. Moreover, the trial court judge did not refer the matter to the ADO.

11.   The ADO's unprecedented attempt to apply and enforce Rule 4.4(a) under the circumstances of this case has shined a spotlight on the critical flaws of Rule 4.4(a), revealing that the rule is unconstitutional both on its face and as applied to Plaintiff in the ADO's Notice.  Rule 4.4(a) indisputably is designed to prohibit categories of speech and conduct and to impose potentially draconian penalties for violations of those prohibitions. But the rule makes the imposition of penalties dependent on a vague and subjective standard ("primary purpose") that establishes no meaningful demarcation between permissible and prohibited speech.

12.   New Hampshire's version of Rule 4.4(a) is unique. It is the only version of that rule in our Nation that discarded the far more rigorous and protective standard set by ABA Model Rule 4.4(a) ("no substantial purpose other than to embarrass"). Paradoxically, the New Hampshire Bar Association Ethics Committee's comment on the deviation from ABA Model Rule 4.4(a) states that the Committee proposed the change in the rule "to set a higher objective standard."  N.H. R. Prof.

Cond. 4.4(a), Ethics Comm. Comment.[5] In fact, the New Hampshire rule is far more subjective than the nearly universally adopted ABA Model Rule 4.4(a).

13.    This pronounced defect of Rule 4.4(a) is particularly troubling when applied to professionals whose duty often requires them to discredit opposing parties and witnesses in an adversarial setting as a matter of routine. Eliciting the truth from the unwilling and attacking untruthfulness is quotidian for criminal and civil litigators. When counsel intentionally challenges a person's credibility, establishes a person's bias, disproves the truthfulness of a person's statements, or exposes a person's unsavory conduct or habits, it is unavoidable that the person will be embarrassed.

14.    Witness embarrassment from cross-examination and counsel's arguments is commonplace in judicial and administrative adversarial proceedings that occur daily throughout the State and the Nation. And in many of those proceedings, such as criminal and civil discovery disputes, attorneys are the witnesses. Courts, in turn, are called upon to render determinations on counsel's credibility when their versions of events clash, as they did in this case. Rule 4.4(a) purports to require lawyers to distinguish between permissible and impermissible embarrassment on the fly, with ruinous consequences for the lawyer if they misjudge that boundary.

15.    This Amended Complaint seeks declaratory and injunctive relief regarding the invalidity of Rule 4.4(a). Plaintiff seeks judicial intervention because the New Hampshire Supreme Court Attorney Discipline Office is attempting to enforce Rule 4.4(a) in a way that is irreparably violating her constitutional rights. The Supreme Court, through state actors in the Attorney Discipline System, has charged the Plaintiff with violating Rule 4.4(a). Since the New Hampshire Supreme Court has the sole state constitutional authority to adopt rules governing the Superior Courts and lawyers, there is no state trial-level forum in which Plaintiff may obtain a declaration of the unconstitutionality of Rule

---

[5] The Ethics Committee's comments are not adopted by the New Hampshire Supreme Court and therefore reflect only the intent of the rule's drafters, not that of the Supreme Court.

4.4(a) and thereby receive timely protection against its enforcement. N.H. Const. Pt. 2, Art. 73-a. Moreover, because the rules do not ensure that the Supreme Court will ultimately review actions taken by the ADO and the Professional Conduct Committee, New Hampshire law provides no guarantee that *any* judicial officer will *ever* consider her constitutional claims.

## JURISDICTION AND VENUE

16.   This District Court has subject matter jurisdiction over Counts I, II, and III under 28 U.S.C. § 1331 because the claims arise under the Constitution and the laws of the United States.

17.   Venue is proper in this District under 28 U.S.C. § 1391(b) because the Defendants conduct their operations in the District, and all of the events or omissions giving rise to these claims occurred in this District.

18.   The District Court may award declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202.

## THE PARTIES

19.   Plaintiff Elena Ben David is a member of the New Hampshire bar and serves as an Assistant County Attorney in the Major Crimes Unit of the HCAO.

20.   Defendants Brian R. Moushegian, Mark P. Cornell, Andrea Q. LaBonte, Sara S. Greene, and Elizabeth M. Murphy are members of the ADO of the New Hampshire Supreme Court, each of whom is being sued in his or her official capacity.  The ADO is a division of the administrative office of the New Hampshire Supreme Court and is part of the Supreme Court's attorney discipline system. N.H. Supreme Ct. R. 37.  The ADO, through its general counsel, is charged with receiving, evaluating, investigating, and docketing professional conduct complaints. N.H. Supreme Ct. R. 37(6)(g)(1).  The ADO's disciplinary counsel is responsible for assessing and prosecuting such complaints.  N.H. Supreme Ct. R. 37(6)(f).  The ADO is responsible in the first instance for the construction and

application of the New Hampshire Rules of Professional Conduct to alleged violations of those rules by New Hampshire attorneys.

21.  Defendants Anthony J. Naro, Elaine Holden, Hon. Peter H. Fauver, Brooksley C. Belanger, and Susan Chollet are members of the Hearings Committee, and have been appointed to the Hearing Panel in the Attorney Discipline System proceedings against Plaintiff, each of whom is being sued in his or her official capacity. Hearings Committee members are lawyers and non-lawyers appointed by the Superior Court.  When Disciplinary Counsel requests a hearing, the Hearings Committee Chair appoints a hearing panel from the Committee's members. Each hearing panel consists of three to five members, with at least one non-lawyer member on each panel.  The hearing panel, after hearing the evidence, makes findings of fact and conclusions of law in a written report and recommends that the Professional Conduct Committee either (1) confirm the hearing panel's determination that a respondent attorney violated one or more Rules and issue a disciplinary sanction, or (2) dismiss the complaint with a finding of no professional misconduct.

22.  Defendants Stephanie C. Hausman, Caroline K. Leonard, Kathleen M. Ames, Ronald K. Ace, Richard C. Gagliuso, Everett S. Grass, Peter J. Kiriakoutsos, Robert R. Lucic, Karyl R. Martin, Robin D. Melone, Mitchell M. Simon, and Eric R. Wilson are members of the Professional Conduct Committee of the New Hampshire Supreme Superior Court (the "PCC"), each of whom is being sued in his or her official capacity.  Hausman is the Chair of the PCC.  Leonard and Ames are Vice Chairs of the PCC. The PCC considers hearing panel reports and memoranda submitted by respondent attorneys and the Disciplinary Counsel and often holds oral arguments. The PCC has the power and duty to (1) direct the actions and performance of the ADO's General Counsel and other staff in the performance of the PCC's adjudicatory functions; (2) to dismiss grievances or complaints; (3) to administer a reprimand, public censure or a suspension not to exceed six months; and (4) to institute proceedings in the New Hampshire Supreme Court in all matters which the PCC has determined

warrants the imposition of disbarment or of a suspension in excess of six months.  It also is authorized to consider and act upon requests for protective orders, and to issue monetary sanctions against a disciplined attorney in the form of the assessment of costs and expenses.

## FACTUAL ALLEGATIONS

### A.    THE UNDERLYING ARSON CASE

#### 1.    HPD's AXON EVIDENCE SYSTEM AND ITS FIRST PRODUCTION OF THE BWC VIDEO EVIDENCE

23.    On September 15, 2022, the HCAO filed criminal complaints against a defendant alleging that she committed arson. The case was investigated by HPD, which uses AXON Evidence System software (the "Platform") in investigations and at crime scenes. HPD officers are equipped with AXON Evidence body-worn cameras that record evidence as it is observed by the police at crime scenes.

24.    The Platform electronically stores BWC Video Evidence and enables HPD to transmit evidence download links to counsel by sending e-mails from the Platform's website.  The Platform e-mails are unique and highly distinctive, displaying a black banner with a yellow pyramid warning logo[6] adjacent to the words **"AXON Evidence.com"** and an unmistakable title in large, bold, blue font stating **MY.EVIDENCE.COM**. The sender is identified as **"Axon <noreply@evidence.com>."**

25.    The e-mail often contains a description of what is being transmitted, the case name, and link's expiration date. An AXON link remains valid for ten (10) days. Defense counsel accesses the discovery by clicking on the link. This downloads the evidence from the link to the defense counsel's computer.  Once the discovery is downloaded, there is no further need for the evidence link.

26.    AXON's website maintains a sophisticated electronic audit system that tracks the exact time when discovery, including BWC Video Evidence, is transmitted by HPD to defense counsel and

---

[6] The AXON logo on its evidence download links appears as follows:

the time at which defense counsel downloads the discovery. The system generates logs documenting the precise time at which evidence is accessed by the police and transmitted to prosecutors, defense counsel, and other law enforcement agencies.  The logs further show when the recipients downloaded the evidence.

27.   As part of standard practice, after Attorney Doe entered his appearance in the case, the HCAO instructed HPD to provide the BWC Video Evidence in the case to Attorney Doe.

28.   On September 29, 2022, at 8:51 p.m., HPD sent the BWC Video Evidence to Attorney Doe by an e-mail discovery link.[7]  The Platform recorded that Attorney Doe received the e-mail at 8:52 p.m. and that Attorney Doe downloaded the BWC Video Evidence to his computer on September 30, 2022, at 8:52 a.m., the next day. True and accurate copies of the AXON Evidence Audit Logs in this case are attached as Exhibit 1.[8]

29.   On October 4, 2022, Attorney Doe e-mailed Plaintiff, her Assistant, and HPD acknowledging receipt of the BWC Video Evidence and requesting other discovery. In her reply to this e-mail, Plaintiff requested that Attorney Doe send discovery requests only to her and not to her Assistant or the police. She made this request both to maintain awareness and control over discovery and because Attorney Doe's conduct toward staff had previously reduced a member of the HCAO's support team to tears.

2.   FAILED PLEA DISCUSSIONS

_____

[7] The e-mail included the following specific information:  (1) the defendant's name; (2) a description of the evidence as a "link to download body-cam footage;" and (3) notice that the link was "valid for 10 days" and would expire on October 9, 2022, at 9:51 p.m. Once downloaded, Attorney Doe had unfettered access to the video evidence and no longer needed the link.  To view the BWC Video Evidence, Attorney Doe simply had to click onto the downloaded file on his own computer.

[8] Several exhibits to this Amended Complaint contain redactions given the nature of the ADO's claims against Plaintiff and Attorney Doe's claim that Plaintiff embarrassed him.

30.  On October 12, 2022, Attorney Doe attempted to obtain a lenient pre-indictment outcome for the defendant by sending an e-mail to Plaintiff stating his client would "entertain" a misdemeanor conviction with no incarceration, but she would not plead guilty to a felony.  In the e-mail, Attorney Doe wrote that he had "finished a lengthy meeting with my client" and that **"I watched portions of the body cameras."** A true and accurate copy of the October 12, 2022 e-mail is attached as <u>Exhibit 2</u>.  Attorney Doe later confirmed that he reviewed the BWC Video Evidence with his client during a meeting on October 12, 2022, three days after the original link had *expired*, thereby demonstrating that he had downloaded and stored the video evidence and could access it, even after the link had expired.

31.  On November 22, 2022, Plaintiff sent a plea offer by e-mail to Attorney Doe, stating the State would agree to recommend that the defendant serve a jail term of one year on a guilty plea to a felony charge. Attorney Doe immediately replied that his client rejected the proposed plea and would request a trial date.

**3.      HPD'S PRODUCTION OF A SECOND "COURTESY" LINK TO ATTORNEY DOE**

32.  On Friday night, November 25, 2022, Attorney Doe e-mailed Plaintiff and her Assistant requesting that she re-send the "Axon link" to the BWC Video Evidence because the prior link had "*expired.*"

33.  In her reply on Monday, November 28, 2022, Plaintiff reminded Attorney Doe to send discovery requests only to her and not her Assistant.  Attorney Doe quickly challenged Plaintiff, questioning whether it was "your policy or an official policy."  One minute later, he followed up with a demand that Plaintiff "send it ASAP."

34.  That afternoon, at approximately 2:00 p.m., at Plaintiff's request, her Assistant sent an e-mail to HPD requesting the police to resend the link to Attorney Doe.  Attorney Doe and Plaintiff were copied on the e-mail to HPD.

35.   On November 28, Attorney Doe knew (1) the Plaintiff had agreed to provide him with another discovery link; (2) the Plaintiff had requested HPD to send the discovery link on the first business day following his request; and (3) HPD was the party that would send the link to him through the Platform.

36.   Later that afternoon, Attorney Doe e-mailed Plaintiff and her Assistant, stating, "FYI— I did not receive anything yet." Plaintiff replied, "For the *third* time, I am asking you to send your discovery requests to me.  If this happens again, I will take it up with the Superior Court" (emphasis supplied).

37.   In response to a proper request that Attorney Doe follow standard discovery protocol, he wrote: "You do not dictate who I send e-mails to…feel free to file a motion and waste time…."  A true and accurate copy of the e-mail exchange on November 28, 2022 is attached as Exhibit 3.

38.   On Monday, November 28, 2022, at 9:18 p.m., HPD sent the second courtesy link to Attorney Doe from the e-mail address **"Axon<nonreply@evidence.com,"** which displayed the unique AXON logo and the large, blue title "**MY.EVIDENCE.COM**."

39.   The e-mail (1) provided the defendant's name, (2) stated the link was to "download body-cam footage," and (3) warned that it was only valid for 10 days.  At 9:19 p.m., Attorney Doe received the download link with the BWC Video Evidence, as detailed on the AXON Evidence audit log report. *See* Exhibit 1.

40.   On Tuesday, November 29, 2022, Attorney Doe nevertheless sent a hostile e-mail to Plaintiff, wrongly accusing her of failing to provide a second link to him and erroneously claiming she was "moving slowly" and trying to "make things difficult." A true and accurate copy of the November 29, 2022 e-mail is attached as Exhibit 4.  Although Attorney Doe had already received the second link, he threatened to "file an appropriate pleading" if she did not provide a second link to him by the end

of the day.  Later that night, Plaintiff replied to Attorney Doe, stating HPD had been asked to resend the link (*i.e.*, "We have asked Hillsborough to resend you the [BWC Video Evidence]").

### 4.    "COUNSEL'S" FIRST MOTION TO COMPEL AND THE STATE'S OBJECTION

41.    On Wednesday night, November 30, 2022, Attorney Doe filed "Counsel's Motion to Compel Discovery and for Sanctions" (the "First Motion").  The First Motion erroneously portrayed a legitimate discovery dispute alleging that (1) Attorney Doe did not have access to the BWC Video Evidence; (2) Plaintiff refused to provide him with a second link; (3) the Plaintiff had violated the defendant's constitutional rights by not producing the BWC Video Evidence; and (4) Plaintiff should be sanctioned for prosecutorial misconduct. Attorney Doe's First Motion *omitted* material facts, including (1) at the outset of the case, Attorney Doe had downloaded onto his computer the first discovery link of the BWC Video Evidence that HPD had provided to him; (2) Attorney Doe had reviewed the BWC Video Evidence with his client after that link expired; and (3) in his e-mail to Plaintiff on October 12, 2022 in which he proposed that his client receive a lenient plea outcome, Attorney Doe made clear that he had already reviewed the BWC Video Evidence.  The First Motion also falsely stated that Attorney Doe did not receive the second link.

42.    In the early morning of December 1, 2022, Plaintiff filed the State's Objection Counsel's First Motion to Compel, which included "Exhibit A," an attached e-mail from HPD setting forth the chronology of its two productions of the BWC Video Evidence to Attorney Doe on September 29, 2022, and November 28, 2022.  A true and accurate copy of the State's Objection to Counsel's First Motion to Compel is attached as Exhibit 5.

43.    Records of the Hillsborough Superior Court E-File system confirm that on December 1, 2022, at 6:54 a.m., Attorney Doe accessed the State's Objection that included the chronology of HPD's production of the BWC Video Evidence to Attorney Doe.  A true and accurate copy of the Hillsborough Superior Court E-File system record for December 1, 2022 is attached as Exhibit 6.

44.    The State's Opposition and "Exhibit A" demonstrated that (1) Attorney Doe had full access to the BWC Video Evidence that he had downloaded at the outset of the case; (2) he had used the "expiration" of the first discovery link as a pretext to request a second link; (3) Attorney Doe had received a second discovery link within one business day of his request; (4) the second discovery link was still active and HPD would not send a third discovery link; and, (5) there never was a legitimate discovery dispute.

45.    On December 1, 2022, at 10:35 a.m., having just accessed the State's Objection, Attorney Doe sent an e-mail to Plaintiff claiming that he did not have BWC Video Evidence.  As an excuse, Attorney Doe later claimed that he could not find the second courtesy link because he had searched his e-mail system using "the wrong search parameters." Even though Plaintiff knew that Attorney Doe had received, downloaded, and viewed the BWC Video Evidence, she nonetheless provided a *third* copy of it to him by mail on December 2, 2022.

### 5.    "COUNSEL'S" SECOND MOTION TO COMPEL

46.    The next day, December 2, 2022, Attorney Doe filed a second "Counsel's" motion to compel (the "Second Motion"), while his First Motion was pending.  He did so having just accessed the State's Objection, which set forth evidence that he had *downloaded* the BWC Video Evidence onto his computer at the outset of the case *before the link had expired*. Although faced with evidence undermining his pending motion and warranting withdrawal of that motion, Attorney Doe instead inexplicably chose to double down on his position.

47.    In his Second Motion, he admitted downloading "*some evidence,*" which he did not identify. However, he failed to disclose *when* he had downloaded the evidence and professed that he could not locate it on his computer.  Counsel's Second Motion still did not acknowledge that the State had provided him with a second link or even mention the State's Objection or "Exhibit A".

48.   Rather, Attorney Doe chose to publicly attack Plaintiff.  In his Second Motion, Attorney Doe accused Plaintiff of aberrant behavior, labeled her a **"passive-aggressive obstructionist,"** and asserted that, "Given the lack of professional Courtesy, Counsel is no longer willing to accept discovery via e-mail …."  Attorney Doe made this claim even though he had no in-person or telephonic exchanges with Plaintiff up to this point in the case.  He further provided no documentary evidence supporting his caustic accusations.  Counsel's Second Motion repeated the charge that Plaintiff had engaged in a "level of non-feasance" justifying monetary sanctions for prosecutorial misconduct.

49.   Days later at the Dispositional Conference on December 6, 2022, Attorney Doe professed that he would not have filed the Second Motion had he seen the chronology of the HPD's production of the BWC Video Evidence.  However, the Hillsborough Superior Court E-File System shows that Attorney Doe had indeed accessed the State's Objection—which attached "Exhibit A"—on December 1, 2022, at 6:54 a.m., a full day *before* he filed the Second Motion.  *See* <u>Exhibit 6</u>.[9]

50.   On December 2, 2022, at approximately 4:00 p.m., Plaintiff sent a *fourth* production of the BWC Video Evidence to Attorney Doe by a Microsoft OneDrive link, which he accessed on December 3, 2022, at 9 a.m., according to an automatically-generated receipt.  Having now received four productions of the BWC Video Evidence, Attorney Doe still did not withdraw his motions to compel and requests for sanctions.

### 6.   UNCIVIL COMMENTS MADE BY ATTORNEY DOE BEFORE THE DISPOSITIONAL CONFERENCE

51.   Over a five-day period preceding the Dispositional Conference, Attorney Doe sent several hostile and antagonistic e-mails to Plaintiff, which displayed his enmity and lack of respect for

---

[9] Even in the unlikely event that Attorney Doe did not carefully evaluate "Exhibit A" or the State's Objection, he received a copy of the pleading and had constructive notice of "Exhibit A."

her.  During that same time, Attorney Doe also filed public Superior Court pleadings in which he wrongfully attacked Plaintiff's character, ethics, and professionalism.  Statements in Attorney Doe's e-mails and Superior Court pleadings include the following:

### STATEMENTS IN E-MAILS

- "You do not dictate who I send e-mails to…"

- "[F]eel free to file a motion and waste time…."

- "We can despise one another professionally"

- "[Y]ou can make things difficult, like moving slowly on sending me another link to the discovery"

- "This is very simple request"

- "I am tired of wading my way through animosity and nonsense"

### STATEMENTS IN PUBLIC SUPERIOR COURT PLEADINGS

- "This case stands out as an aberration for unknown reasons"

- "Given the lack of professional courtesy, Counsel is no longer willing to accept discovery via e-mail"

- "For reasons known only to the State, in this particular case, it has adopted a passive-aggressive obstructionist approach that could have been solved very quickly"

- "Counsel requests that all body camera footage be sent to him on DVDs"

- "Since the filing of Counsel's first motion, Counsel has repeatedly requested access to the e-discovery via a hyperlink, including calling a supervisor a second time"

- "Given this level of non-feasance, Counsel seeks sanctions of one hundred dollars"

52.  Attorney Doe's lack of civility towards Plaintiff foreshadowed his comments about her at the upcoming conference.

### 7.    THE DISPOSITIONAL CONFERENCE

53.   The Dispositional Conference in the arson case was held on December 6, 2022.[10]   The Superior Court asked whether counsel had an opportunity to discuss a resolution.   After Plaintiff reported the status of the parties' unsuccessful plea negotiations, Attorney Doe requested the Superior Court to schedule a criminal mediation. Plaintiff objected to mediation, and referred the Superior Court to Attorney Doe's two motions and the State's Objections, noting they might inform the Superior Court on why a mediation would be unproductive.   Plaintiff specifically suggested that the Superior Court review "Exhibit A" attached to the State's Objection.

54.   The Superior Court had not previously read the Superior Court pleadings and took time to quickly review them during the hearing.   The discussion then turned to the merits of the motions, during which the Superior Court asked questions to both counsel and permitted counsel for both parties to proceed by proffer.

55.   At the hearing, Attorney Doe was not only counsel for the defendant but also the movant on the sanctions motions and the only witness in support of them.   He was the sole recipient of HPD's transmittal of the discovery links by e-mail on September 29, 2022, and November 29, 2022, and the only witness for the defendant who had communicated with the State about his discovery requests.

56.   The Superior Court initially focused on "Exhibit A," HPD's e-mail, and questioned Attorney Doe about his representation that the discovery link had expired:

> [I]n this Motion, you say that the link to the – this is for the body cam; right, has expired and in the State's Objection, they provide an affidavit from the police saying the link was good until December 8th.

57.   Attorney Doe did not directly answer the question, but rather attempted to change the subject while making a personal attack on Plaintiff as follows:

> Correct, sir. So, um, there's a lot to say here. So, um, I want to talk about their objection to mediation. **I'm not going to let this degenerate into juvenile sniping.**

---

[10]  A copy of the transcript of the Dispositional Conference on December 6, 2022 with notations indicating corrections and omissions is attached as <u>Exhibit 7</u>.

Um, I reject all of her arguments about the way I supposedly treat her. That's completely not true (emphasis supplied).

58.  The Superior Court then commented that the link was "good until December 8th" and was "still good for two more days." The Superior Court directly asked Attorney Doe, "Is that true?" Again, Attorney Doe did not answer the question and failed to admit he had received *any* copy, let alone *multiple copies*, of the BWC Video Evidence in response to his requests.

59.  After thirteen minutes into the thirty-two minutes long hearing, the Superior Court finally remarked, "It seems to me, he [Attorney Doe] needs to get a link." Just as Plaintiff was about to respond, Attorney Doe finally blurted out: "I have it, sir.  I have it.  I have it." He never volunteered this information to the Superior Court, and only admitted having received the link when left with no alternative.

60.  The Superior Court pursued the issue further, asking Attorney Doe *when* he had received the link. Yet again, Attorney Doe did not answer this direct question, claiming that he did not have the link when he filed his Second Motion on December 2, 2022.  He then contradicted this claim, stating Plaintiff had sent him a Share File link *before* he filed the Second Motion, but he did not see it until *after* he had filed the Second Motion.  Attorney Doe's statement could only be understood as arguing that the First Motion had triggered the State's production of the BWC Video Evidence, a claim belied by the facts.

61.  Throughout the conference, Attorney Doe maintained that Plaintiff had failed to timely produce the BWC Video Evidence, never admitting that, well before he had filed either motion, he and his client had already watched the BWC Video Evidence that he had previously downloaded on his computer. Instead, Attorney Doe pursued his claim that Plaintiff delayed or obstructed the production of evidence, stating that it was **"just a ridiculous process to get [the BWC Video Evidence]."**

62.  From a legal, ethical, and reputational standpoint, Attorney Doe's written statements in his pleadings and oral statements at the hearing about Plaintiff were most serious.  He accused Plaintiff of violating federal constitutional law, state law, and the New Hampshire Superior Court rules requiring prosecutors to timely disclose all evidence to a criminal defendant.  He impugned Plaintiff's character, ethics, credibility, and competency and sought to discredit her in the eyes of the judge assigned to try the case.  In essence, Attorney Doe had misled the Superior Court into believing that Plaintiff was an obstructionist who had forced him to seek judicial redress to obtain evidence to which he and his client were entitled under the law.  He also attacked her credibility and ethics before a full courtroom.

63.  In both of his motions for sanctions, Attorney Doe requested the Superior Court to schedule a "show-cause hearing," impose monetary sanctions, and grant "whatever other relief" it deemed appropriate due to Plaintiff's "non-feasance."

64.  If Plaintiff had, in fact, committed the alleged discovery violations, the Superior Court could have imposed monetary and other sanctions against her personally and/or the State, cited her for contempt, and even dismissed the State's case with prejudice.  *See* N.H. R. Crim. P. 12(b)(9) (permitting a court to assess costs and attorney's fees against "the party or counsel" who violates the discovery rules).  Additionally, the Superior Court could have reported Plaintiff to the ADO.

65.  Plaintiff had both a duty and a legal due process right to vigorously and zealously defend herself, the HCAO, and the victims of the arson case, against Attorney Doe's malicious and false allegations.  As a member of the executive branch of government charged with enforcing the law, she alone was responsible for presenting a robust defense of the false allegations. In that regard, Plaintiff had a duty to zealously guard the integrity of the State's case.  Outside of her obligations to the State as its counsel of record, Plaintiff also had a due process right to be heard in defense of her own reputation.

66.  Plaintiff requested and received the Superior Court's permission to respond immediately following Attorney Doe's comment **"that it was just a ridiculous process to get it,"** which mirrored and amplified the accusation in his second motion that Plaintiff had engaged in a **"passive-aggressive obstructionist approach"** regarding his discovery request.

67.  Attorney Doe was ethically prohibited from making false statements to the Superior Court and was required to correct any false statement of fact or law that he had previously made to the Superior Court, as required by N.H. R. Prof. Conduct 3.3(a)(1).  Separately, Attorney Doe, who was required to verify the truthfulness of the facts stated in his motions, also had already represented to the Superior Court that, to the best of his knowledge, there was a sound basis for the motions. *See* N.H. R. Crim. P. 35(i)(1). As the pivotal witness in support of "Counsel's Motion," Attorney Doe's *credibility* was clearly in issue during the hearing.[11]

68.  Attorney Doe similarly placed his professional *competency* at issue.  In his motions and at the hearing, he firmly maintained that he had not received the requested BWC Video Evidence from the State despite his repeated requests. Yet, the State had produced the BWC Video Evidence to Attorney Doe on four occasions before the hearing, including at the very outset of the case. This raised the key issue of whether Attorney Doe's purported non-receipt of the video evidence was due to his own incompetence in failing to handle properly, account for, and maintain sensitive discovery that the State had repeatedly produced to him in a case charging his client with a serious offense.

---

[11] The New Hampshire Rules of Evidence applied to the hearing.  *See, e.g.,* N.H. R. Evid. 101 ("These rules apply to proceedings in the State of New Hampshire Superior Courts); N.H. R. Evid. 1101(b) ("These rules apply generally to all civil and criminal proceedings unless otherwise provided by the constitution of the State of New Hampshire or these rules"). Rules governing relevancy (Rule 401), a witness's prior instances of misconduct (Rules 404(b) and 608), a witness's character (Rule 405), a witness's routine practices or habits (Rule 406), and others governed counsel's presentation of evidence on disputed issues and the credibility of the witnesses and their reputation.

Alternatively, if he was not incompetent, then the Superior Court needed to decide whether he was lying about his avowed non-receipt of the evidence.

69.  Finally, Attorney Doe's ***ethical character*** was in issue because he (1) filed back-to-back, repetitive court pleadings laden with false statements; (2) failed to disclose material information to the Superior Court related to the motions to compel; (3) failed to correct his pleadings; (4) failed to withdraw his pleadings before the Dispositional Conference; and (5) unjustifiably attacked the ethics and credibility of the prosecutor without factual or legal support.

### (1)    Rebuttal to Attorney Doe's "Ridiculous Process" and "Passive-Aggressive Obstructionist" Claims

70.  Plaintiff first addressed Attorney Doe's statements that obtaining the link was a **"ridiculous process"** and that she was a **"passive-aggressive obstructionist."**  These statements referred to Plaintiff's repeated requests that he send his discovery requests only to her—not to her Assistant or the police.

71.  Consistent with the information described by HPD in "Exhibit A," Plaintiff explained the actual process by which HPD had produced the BWC Video Evidence to Attorney Doe.  Plaintiff informed the Superior Court that (1) the State had sent the BWC Video Evidence to Attorney Doe in September 2022; (2) Attorney Doe downloaded the BWC Video Evidence on his computer the next day; (3) in late November, on a non-business day, Attorney Doe requested a second discovery link for the same BWC Video Evidence that he previously downloaded on his computer; and (4) Plaintiff's Assistant e-mailed HPD the next business day requesting HPD to re-send the discovery link to Attorney Doe.

72.  Plaintiff then addressed and directly rebutted Attorney Doe's unfounded claim that it was a **"ridiculous process"** for him to obtain the BWC Video Evidence and the vituperative statement that she had been a **"passive-aggressive obstructionist"** in the discovery process.

73. In light of Attorney Doe's misrepresentations about the discovery process and his hostility during that process, Plaintiff informed the Superior Court that "it's important to put all of this on the record" because Attorney Doe was not answering the Superior Court's simple and direct questions and instead wanted to tell the Superior Court the "history of the case."

74. In that regard, Plaintiff explained that she had encountered problems with Attorney Doe during the discovery process because he refused to honor her repeated requests that he submit his discovery requests only to her and not to non-lawyer personnel, including her Assistant and the police.[12] She also supplied factual justification for why she insisted that Attorney Doe send his discovery requests only to her, providing the Superior Court with a concrete example of Attorney Doe's prior unprofessional interaction with a member of the HCAO's staff. Specifically, Plaintiff stated:

> I have asked [Attorney Doe] numerous times, please, when you e-mail the State for discovery, please e-mail me, not my assistant, not the Hillsboro Police. My assistant doesn't work for him. And for the record, he's made an assistant in our office cry in the past. So, I have a legitimate reason for making that request (Ex. 7 at 16).

75. Although Plaintiff knew many details regarding the incident that were unflattering to Attorney Doe, she made one brief reference to the event and did not belabor the point.

76. Plaintiff was aware of this incident when Attorney Doe was repeatedly e-mailing her Assistant and HPD. She informed the Superior Court of this history to directly repudiate the Attorney Doe's false and defamatory allegations that she was a "passive-aggressive obstructionist" and that she was responsible for a "ridiculous process" involving the production of the discovery link.

---

[12] Attorney Doe defiantly ignored the prosecutor's proper request and repeatedly sent discovery e-mails to her Assistant. Finally, in her third request to Attorney Doe on this issue, Plaintiff wrote that if it happened again, she would "take it up with the Superior Court." Rather than just refrain from communicating with the prosecutor's Assistant, the Defense Attorney responded with a sarcastic and combative retort: *"You do not dictate who I send e-mails to ... feel free to file a motion and waste time ..."*

77.   The primary purposes of Plaintiff's comment were to (1) contradict and refute Attorney Doe's false claims at the hearing and in his court pleadings that she had been an "obstructionist" during the discovery process; (2) demonstrate that her requests that Attorney Doe send his discovery requests to her only was not a "ridiculous process," as he had labeled it; (3) reveal that Attorney Doe was the one who had acted with hostility and had engaged in "aberrant" behavior, not her; and (4) provide another concrete reason why she did not want Attorney Doe interacting with her Assistant given his past unpleasant confrontation with another Assistant.

78.   The ADO has alleged that this statement violated Rule 4.4(a).  Plaintiff did not make this truthful statement to embarrass, delay, or burden Attorney Doe.  Tellingly, in his Grievance, Attorney Doe did not even claim that these statements embarrassed him.

79.   At this point in the hearing, Attorney Doe interrupted, saying he was "going to come in and deal with this, Judge, right now." Although Attorney Doe had asked to attend the conference remotely via Webex because of an unspecified scheduling conflict, he stated, "I'm on my way to court right now and I'm going to *deal* with this *in person, Your Honor, right now*." Plaintiff reasonably viewed Attorney Doe's statements as threats.

80.   The Superior Court responded that Attorney Doe should "continue this now by telephone," after which Attorney Doe again threatened that he was "not listening to this over the phone, sir" and was "on my way in and I'm going to *deal with this in person, sir*." Plaintiff again reasonably perceived Attorney Doe's additional statement as a threat.  The Court, however, responded by insisting that Attorney Doe "hold on for a second," telling him, "We're in the middle of a discussion." The Superior Court then instructed Plaintiff to "Go ahead" with her argument.

### (2)   Rebuttal to Attorney Doe's False Claim About Not Receiving the Second Discovery Link

81.   Plaintiff continued her argument and next addressed Attorney Doe's false accusation that the State had not timely provided him with the second Courtesy link.

82. Plaintiff summarized her receipt of a barrage of e-mails that Attorney Doe sent following HPD's production of the second link to him, in which he complained that he still had not received the second Courtesy link. Instead of waiting 48 hours to follow up on his request, she noted, Attorney Doe made the intemperate decision to file a motion to compel.[13]

83. Plaintiff then refuted Attorney Doe's false accusation that the State had not timely provided him with the second link. She explained that HPD's AXON Evidence System generates a conclusive audit trail that tracks and confirms each delivery and every time the discovery is downloaded. Further, Plaintiff reported that HPD had informed her that (1) it sent the first link to Attorney Doe in September 2022, (2) Attorney Doe received the link and downloaded the video evidence at that time; and (3) HPD sent the second link to him on Monday, November 28, 2022. The Superior Court commented that Plaintiff's recitation of the evidence and events made it clear that she did not believe Attorney Doe, and there was distrust between her and defense counsel.

84. In response, Plaintiff indeed questioned (1) why Attorney Doe claimed that he could not find the BWC Video Evidence that he had already downloaded, and (2) why he represented that had not received HPD's e-mail containing the second link. She pointed out that Attorney Doe had still not responded to HPD's statement of its productions of the link to him, and had even attempted to avoid the Superior Court's question about whether he had received the link by trying to avoid the subject by steering the discussion to mediation. She argued that, in her view, the second link was in Attorney Doe's e-mail box:

> So, where the police are telling me that they did it [sent the download link to the Defense Attorney], I would be interested to see and hear and understand why he can't find the body camera he downloaded the first time and why he says that he's not

---

[13] Plaintiff further described why the motion to compel violated Superior Court rules. She argued that under N.H. R. Crim. P. 12(b)(6)(C), which governs motions seeking additional discovery, Attorney Doe was required to explain "the reasons the State has provided, if any, for refusing to provide the requested materials." She pointed out to the Superior Court that the motion to compel did not state why the State was refusing to provide him with the discovery link because it had agreed to provide a second link. She added that Attorney Doe had joined the motion to compel with a motion for sanctions so he would not have to request the State's position on the motion.

receiving the e-mail that the police sent him. Your Honor, even after – even after filing that Motion, his second Motion to Compel came almost 24 hours later, in which he's claiming he doesn't have it. He's not responding to the Hillsboro Police's statement. It's very clear that they did send it to him. He's not responding to that. Even when Your Honor asked him this morning, did you or didn't you receive it, he wanted to talk about mediation. **So, what is the status of that link? I bet it's somewhere in his e-mail box** (Ex. 7 at 21) (emphasis supplied).

85.  To further counter Attorney Doe's position that he had not timely received the second link, Plaintiff sought to show that Attorney Doe was habitually reckless in the practice of law.  She cited, as an example, that Attorney Doe he had been "recently reprimanded because of his trust account was out of compliance by fifteen thousand dollars"[14] (Ex. 7 at 24).  Plaintiff offered this evidence as an example of recklessness in response to Attorney Doe's repeated assertions that she had unlawfully and unethically interfered with his client's discovery rights and should be sanctioned as a result.

86.  The issue before the Superior Court was whether Attorney Doe had received the BWC Video Evidence before he filed his first motion and currently had access to it, and, if not, why not.  Attorney Doe's theory was that Plaintiff had simply stonewalled him and refused to produce the evidence.  Plaintiff's theory was that Attorney Doe had been repeatedly given the BWC Video Evidence, and assuming he was not simply being untruthful, the explanation for why he could not locate the evidence lay in his carelessness and disorganization.

87.  Indeed, Attorney Doe later represented to the ADO that (1) he could not locate the previously downloaded video evidence; (2) he lost or "misfiled" the downloaded evidence; (3) he cannot keep pace with modern technology; and (4) he inadvertently loses discovery.  The ADO nonetheless has alleged that Plaintiff's reference to the then-public record of Attorney Doe's

---

[14] Plaintiff did not need to detail the misconduct underlying the infraction for the Superior Court because Attorney Doe's 2019 Reprimand was publicly available at that time on the New Hampshire Supreme Court's ADO' website.

reprimand for carelessness and mismanagement of his client trust account had the "primary purpose" of embarrassing, burdening, or delaying Attorney Doe.

88.   Noting that Attorney Doe had failed to withdraw his motions, Plaintiff next urged the Superior Court to impose sanctions against him for wasting the Superior Court's and the state's time (Ex. 7 at 22).  In support of her request, she offered to obtain the electronic log from HPD that "will guarantee it [the second download link] went to his [Attorney Doe's] e-mail" (Ex. 7 at 22).

89.   At that point in the hearing, the parties were at odds regarding the State's production of the second link.  Attorney Doe continued to conceal the fact that he had previously watched the BWC Video Evidence with his client, and he falsely claimed the State did not produce the second Courtesy link until after he had filed the first motion to compel.  The Plaintiff's position was diametrically opposed to that of Attorney Doe's. She maintained that Attorney Doe had downloaded the video evidence from HPD in September 2022, and that HPD provided him with a second Courtesy link on November 28, 2022. Both counsel had requested that the other be sanctioned for their alleged misconduct.

90.   The ADO nonetheless has alleged that the reference to the then-public record of Attorney Doe's reprimand for carelessness and mismanagement of his client trust account had "the principal purpose of embarrassing" Attorney Doe.  Plaintiff did not reference the matter to embarrass or burden Attorney Doe.  In fact, she made one brief reference to the reprimand for the Superior Court's benefit and refrained from providing further facts, all of which were a matter of public record.

91.   Indeed, Attorney Doe has since represented to the ADO that (1) he could not locate the previously downloaded BWC Video Evidence; (2) he lost or "misfiled" the downloaded evidence; (3) he cannot keep pace with modern technology; and (4) he inadvertently loses discovery.

**(3)    Rebuttal to Attorney Doe's Misleading Attempt to Bolster His Credibility**

92.  Rather than address the factual points that Plaintiff had made, Attorney Doe instead chose to engage in yet another public *ad hominem* attack of Plaintiff by stating he intended to file a grievance against her:

> No, Judge. Judge, no, no, no, no, no, no. This is done. This is done, Judge. I'm not, I'm going to file a PCC complaint on this prosecutor. Your Honor, I've had enough. I've had enough of her grandstanding. I'm not going to say another word (Ex. 7 at 24).

93.  From Plaintiff's perspective, Attorney Doe's public statement before a court full of attendees was yet another accusation that she had committed professional misconduct and was made for the sole purpose of publicly burdening, delaying, and embarrassing her in her defense of his frivolous motions.

94.  At that point, the Superior Court indicated that he would deny both of Attorney Doe's motion for sanctions, stating, he thought the parties needed to do "sit down" [an apparent reference to a meeting] (Ex. 7 at 24-25). However, Attorney Doe interrupted the judge, stating that he would not meet with the prosecutor and again, in open Superior Court, declared that he was "filing a PCC complaint based on what she just did" (Ex. 7 at 25). Plaintiff perceived Attorney Doe's statement in this respect as a further intimidation tactic used in retaliation for Plaintiff's bearing witness to the court.

95.  Attorney Doe then stated that he had "to defend his integrity on the record," promising the Superior Court that he would not "attack" Plaintiff. He attempted to explain why he had filed the Second Motion, stating he would not have done so if he had seen the link in advance: "Your Honor, if I got a response saying that the link had been sent or if I had seen the link, Exhibit A, obviously I wouldn't have filed it"( Ex. 7 at 31).

96.  However, according to the Superior Court's electronic filing system, Attorney Doe had, in fact, accessed the State's Objection with "Exhibit A" on December 1, at 6:54 a.m., which was the day *before* he filed the Second Motion.

97.  Attorney Doe then made the following menacing remark:

I'm not here to make trouble.  I've been in private practice for 12 years.  **I've served in the Marine Corps.  I've been a police officer; I've been a prosecutor.**  I've been doing this for over 20 years.  So, if someone wants to shoot my integrity by referencing a trust issue, wait until I'm there in Superior Court, look me in the eyes and ***do it.***  Because I'll tell you just to finish this though, Your Honor, before I get too heated, I self-reported that issue to the Bar (emphasis supplied) (Ex. 7 at 31).

98.  Plaintiff was aware of the implication that Attorney Doe was attempting to wield with his threats thinly-veiled by his simultaneous attempt to bolster his credibility by touting his past credentials.

99.  Plaintiff considered these representations misleading because she knew that Attorney Doe had resigned from his position as a prosecutor at the HCAO as part of his resolution of a publicly reported matter with the State, whereby Attorney Doe and the State agreed that he would never serve the State of New Hampshire as a prosecutor or police officer again.  Accordingly, Plaintiff responded to Attorney Doe's threats by stating, "I just wonder if the Superior Court is aware of which the circumstances under which [Attorney Doe] left the Hillsborough County Attorney's Office."

100. At that time, a simple Google search revealed the circumstances under which Attorney Doe resigned from the HCAO.

101. The purpose of Plaintiff's comment was to ***persuade*** the Superior Court to reject the unfair inference that Attorney Doe had attempted to create about his integrity and credibility based on holding positions as a former prosecutor and police officer.  Attorney Doe opened the door as to this issue, and from Plaintiff's perspective, if the Superior Court were to consider this information in ruling on the motions, then it should know the truth about why he left the HCAO.

102. Plaintiff did not make the statement to delay, embarrass, or burden Attorney Doe.  Once again, she did not divulge any facts or details pertaining to the circumstances and instead restrained her response. The ADO has alleged that Plaintiff's statement had "the primary purpose of embarrassing" Attorney Doe.

103. That day, the Superior Court authored an order on the First Motion opining that "the Court is not **persuaded** that any delay by the State in producing the link would warrant the imposition of sanctions" (emphasis supplied). The Superior Court did not send notice to the Parties, however, of its decision on the First Motion until December 12, 2022.

### 8.    ATTORNEY DOE'S ADMISSION THAT HE RECEIVED THE LINK

104. On December 8, 2022, just two days after the Dispositional Conference, Attorney Doe sent three e-mails to Plaintiff regarding the allegedly missing e-mail that HPD sent to Attorney Doe on Monday, November 28, 2022, transmitting the second "courtesy" discovery download link of the BWC Video Evidence to him.

105. In the first e-mail, sent at 6:52 a.m., Attorney Doe stated: "I have searched my e-mail several times and I am unable to find the link sent to me by Hillsboro PD.  Do you have the sender's e-mail address?"  Two minutes later, at 6:54 a.m., Attorney Doe sent the second e-mail in which he forwarded the first e-mail that HPD had sent to him on September 29, 2022, at 8:52 p.m., transmitting the AXON Evidence discovery download link to the BWC Video Evidence.  The e-mail contained the distinctive AXON Evidence logo and an unmistakable title in large, blue, 22-point bold font stating **MY.EVIDENCE.COM.**  Attorney Doe wrote, "This is the only link I can find."  A true and accurate copy of the second December 8, 2022 e-mail is attached as Exhibit 8.

106. Attorney Doe failed to attach the September 29, 2022 e-mail to his motions to compel or even reference his prior receipt of the discovery in his First Motion.  Had he done so, the e-mail would have shown that HPD had produced the BWC Video Evidence to Attorney Doe at the beginning of the case.  In addition, HPD's unique AXON Evidence e-mail with the huge **MY.EVIDENCE.COM** heading would have cast serious doubt on any claim that Attorney Doe, who was closely monitoring his e-mail on November 28 while waiting for HPD to produce the second link, could possibly have "inadvertently deleted" such a distinctive and unusual e-mail.

107. Finally, twenty-three minutes later, at 7:17 a.m., Attorney Doe sent a lengthy third e-mail to Plaintiff and her supervisor, admitting that he had, in fact, received the second "Courtesy" link that HPD had sent him on November 28, 2022.  Attorney Doe wrote: "Just now, I searched using the term Axon—I located the link in my e-mail trash from November 29th that **I must have inadvertently deleted**" (emphasis supplied).  Attorney Doe promised to "file a pleading to correct the record on various issues the State raised" and he would "note this fact." Notably, although Attorney Doe claimed that he had the November 28, 2022 e-mail and had earlier forwarded the initial September 29, 2022 e-mail to Plaintiff, he specifically did not produce the allegedly "inadvertently deleted" e-mail.  A true and accurate copy of the third December 8, 2022 e-mail is attached as Exhibit 9.

108. In the same e-mail, however, Attorney Doe accused Plaintiff of embarrassing and harassing him in a public setting.  Having copied Plaintiff's supervisor on the e-mail, Attorney Doe explained that he was providing him with a "Courtesy notification" and would "leave it to your office to conduct an internal review of this matter."  From Plaintiff's perspective, Attorney Doe's insinuation that her supervisor conduct an "internal review" was a malicious and unethical act aimed at interfering with her employment as an Assistant County Attorney, in which Attorney Doe's primary purpose in making that request was to embarrass, burden, and delay her.

109. By mid-day, Attorney Doe still had not notified the Superior Court that he had timely received multiple copies of the video evidence, as represented by the State, and had allegedly deleted the copy that was a critical subject of his motions to compel.[15]  Accordingly, Plaintiff filed a Supplemental Objection to "Defense Counsel's" motions to compel and attached a copy of Attorney Doe's e-mail in which he admitted that he had received the link to the video evidence.  The Supplemental Objection requested the Superior Court to deny both motions to compel and requests

---

[15] Attorney Doe has never produced the allegedly deleted e-mail that HPD sent to him on November 28, 2022.

for sanctions.  Later that day, Attorney Doe filed a response to the State's Supplemental Objection that failed to confirm his receipt of the second link he claimed to have located in his "e-mail trash."

110. Three days later, on December 11, 2022, Attorney Doe finally acknowledged to the Superior Court that he downloaded and watched *the BWC Video Evidence* at the outset of the case, and that he subsequently received a second download link the State sent to him on November 28, 2022— all before he filed any motion to compel or requested the court sanction the Plaintiff. Despite this fact, and the fact that the majority of these admissions were in a footnote and subparagraphs, the pleading did not refer to Attorney Doe's duty to correct the record.  It belatedly requested withdrawal of both motions, which the Superior Court had already denied.[16]  To defend his filing of the Two Motions and requests for sanctions, Attorney Doe again blamed the State, essentially claiming it was the State's fault for not telling him to read his own e-mails after it sent the link to him.[17]

111.   The next day, December 12, 2022, Attorney Doe filed a Grievance against Plaintiff with the ADO.

**B.    ATTORNEY DOE'S DESTRUCTION OF HPD'S E-MAIL TRANSMITTING THE SECOND "COURTESY" DISCOVERY LINK TO HIM**

112. While the arson case was pending, including through the appellate process, Attorney Doe had an obligation to preserve all evidence in the case, including the BWC Video Evidence.  The

---

[16] On December 12 and 14, 2022, the Superior Court issued its written Orders, dated December 6 and 9, respectively, denying both Attorney Doe's two motions to compel and requests for sanctions. The Order dated December 6 stated that the Superior Court was "not persuaded that any delay by the State in producing the link would warrant the imposition of sanctions." The Order dated December 9 denied the second motion as "moot given counsel's receipt of the request [sic] information."

[17] Contrary to that representation, the State did inform Attorney Doe in writing that (1) it had requested HPD to provide him with a second discovery link, and (2) HPD produced the link to him on the first business day following his request.  Yet, as soon as the State provided Attorney Doe with an e-mail from HPD verifying that it had sent the second link to him, he quickly filed the ***Second Motion*** in which he continued to misrepresent that the State was still refusing to provide him with a second link.

deletion or destruction of the BWC Video Evidence could hamper the defendant's ability to defend the case at trial or to prevail in any post-trial appeal. Premature destruction of evidence, in turn, could constitute ineffective assistance of counsel under the Sixth Amendment to the U.S Constitution and part I, article 15 of the New Hampshire Constitution. The arson case remained pending until April 15, 2025, when the New Hampshire Supreme Court affirmed the defendant's convictions.

113. Aside from his legal obligation to preserve evidence in the arson case, Attorney Doe had separate legal and ethical obligations to preserve the same evidence in connection with the Grievance that he had filed against Plaintiff on December 12, 2022, and the Cross-Grievance that she had filed against him on December 30, 2022. Both matters involved the events surrounding HPD's production of the BWC Video Evidence in the arson case. *See* N.H. R. Prof. Conduct 3.4(a) (precluding counsel from unlawfully obstructing another party's access to evidence or unlawfully altering, destroying or concealing a document or other material having even "potential evidentiary value").

114. Aware of the significance of the BWC Video Evidence in the pending proceedings, on December 12, 2023, at the arson defendant's sentencing hearing, Attorney Doe nonetheless unsuccessfully attempted to obtain the Superior Court's approval to destroy the evidence in the case.

115. Attorney Doe submitted two proposed sentencing sheets requesting the Superior Court to order HPD to destroy the evidence in the case. True and accurate copies of the sentencing sheets are attached as Exhibit 9. The evidence destruction request encompassed the AXON Evidence system materials, including the audit logs and transmission/download metadata that documented (1) when HPD sent discovery links to Attorney Doe; (2) when Attorney Doe received the discovery links; and (3) when Attorney Doe had downloaded the BWC Video Evidence.

116. The AXON logs were the same records that definitively proved that Attorney Doe had received and viewed the BWC Video Evidence well before he accused Plaintiff of committing prosecutorial misconduct in his First and Second Motions and two requests for sanctions.

117. On August 27, 2024, counsel for Plaintiff issued a "Notice to Preserve Evidence" to Attorney Doe, specifically requesting to him to refrain from deleting or altering the discovery obtained from the HPD, including the November 2022 e-mail:

> Additionally, you are requested not to delete or alter the evidence produced to you as discovery in the [Defendant's Name] case by the Hillsboro Police Department and the Hillsborough County Attorney's Office specifically including evidence that you downloaded on your computer from AXON links that you received on September 29, 2022, November 28, 2022, and yet again in early December 2022.

A true and accurate copy of the Notice to Preserve Evidence, which was also provided to the ADO on August 27, 2024, is attached as Exhibit 10.

118. On November 3, 2024, Attorney Doe made a written submission to the ADO in which he admitted deleting e-mails from his inbox and e-mail trash file as well as other "materials" from his computer hard drive:

> I used to delete the e-mails since the links expired. That habit has since changed. Also, it was part of my practice to periodically delete all e-mails in my trash bin permanently. **This e-mail cleanse was not performed according to a fixed schedule.** Instead, I tried to keep my Gmail account running efficiently when I received periodic warnings about allocated storage space. Finally, I deleted materials from my desktop hard drive to make more room for additional discovery (emphasis supplied).

In the same submission, he also disclosed that his "older laptop stopped working."

119. Later, in early 2025, when the ADO disclosed all relevant documents to Plaintiff at the time of the filing of its Notice of Charges, as required, it did not provide the e-mail that HPD had sent to Attorney Doe on November 28, 2022, transmitting the second "courtesy" discovery link to the BWC Video Evidence. It failed to disclose that the e-mail had been destroyed.

120. Had the e-mail been preserved, it likely would have contained metadata, including a header noting when the email was received by Attorney Doe.

121. During a telephone conference between counsel for Plaintiff and the ADO, counsel for Plaintiff noted that the ADO had not produced the November 28, 2022 e-mail, and inquired whether

the ADO had possession of the document. The ADO's counsel replied that the ADO did not have the e-mail, and would inquire whether Attorney Doe had the e-mail.

122. Days later, the ADO sent written confirmation to counsel for Plaintiff to "confirm the ADO does not have a copy of the e-mail" that was referenced on the call. Disciplinary Counsel added, "[Attorney Doe] informs me that he does not have a copy."

123. Attorney Doe had a legal and ethical duty to preserve the HPD e-mail transmitting the second "courtesy" discovery link until the culmination of all pending proceedings in which that evidence was relevant. He easily could have done so in a host of simply ways, including by (1) moving the allegedly deleted e-mail with the link back to his Inbox; (2) filing the e-mail it in his client's file folder; (3) printing a hard copy of the document; (4) copying the e-mail to another electronic device; (5) producing the e-mail to the ADO in electronic and/or paper copies; or (6) taking all of these actions.

124. The ADO similarly had an obligation to take necessary steps to ensure that the parties, and particularly Attorney Doe, who had filed the Grievance, preserved relevant documents and information, particularly the e-mail that was the focal point of the dispute.

## C.    ATTORNEY DOE'S GRIEVANCE

125. Attorney Doe filed a two-page Grievance against Plaintiff with the ADO on December 12, 2022. This was one day after he had disclosed to the Superior Court that the State had properly and promptly delivered the second "Courtesy" copy of the discovery download link of the BWC Video Evidence to him on November 28, 2022.

126. In filing his Grievance, Attorney Doe was required to comply with N.H. R. Prof. Conduct 3.3(a), titled "Candor Toward the Tribunal." Under Rule 3.3(a)(1), Attorney Doe was prohibited from knowingly "mak[ing] a false statement of fact or law to a tribunal or fail[ing] to correct a false statement of material fact or law previously made to the tribunal by the lawyer." In addition, Rule 3.3(c) provided

that, "[i]n an ex parte proceeding, a lawyer shall inform the tribunal of all material facts known to the lawyer that will enable the tribunal to make an informed decision, whether or not the facts are adverse." The ADO is a "tribunal," which includes an "administrative body or other body acting in an adjudicative capacity." *See* N.H. R. Prof. Conduct 1.0(m).

127. In his Grievance, Attorney Doe claimed that, at the time of the Dispositional Conference, he did not believe he had **any** copy of the BWC Video Evidence and that the State had violated its discovery obligations. In Attorney Doe's words, "At that time, in good faith, I believed I had not received it [the BWC Video Evidence]."

128. In his Grievance, Attorney Doe again conspicuously failed to disclose that on October 12, 2022, approximately six weeks before he filed his two motions to compel, he met with his client at his office, where they watched the BWC Video Evidence that he had downloaded on his computer on September 30, 2022.

129. Two years later, when Attorney Doe was again confronted with documentary evidence contradicting his representation (*i.e.*, "in good faith, I believed I had not received it"), Attorney Doe was forced to admit to that the State had timely produced the requested evidence to him and he already had reviewed that evidence with his client in preparation of his defense before accusing Plaintiff of committing prosecutorial misconduct.

130. Attorney Doe's representations in his Grievance and his omissions from the Grievance call into question whether he complied with his duty of candor owed to the attorney discipline system under Rule 3.3.

131. In his Grievance, Attorney Doe accused Plaintiff of setting out to "embarrass and harass" him during the Dispositional Conference in violation of Rule 8.4(g), not Rule 4.4(a).

132. As to the comment about Attorney Doe's mismanagement of his clients' funds resulting in a reprimand by the ADO, Attorney Doe conceded in his Grievance that "what she [the prosecutor]

stated was true." As to the statement about his departure from the HCAO, Attorney Doe admitted to "an incident in 2011 …. [t]he underlying arrest" of which, he claimed, "has been annulled and vetted with the ADO without any finding of professional misconduct." Attorney Doe made no mention Plaintiff's comment that he had made an Assistant of the HCAO cry.

133. Attorney Doe concluded his Grievance by arguing that Plaintiff was "a newer prosecutor" who "needs to understand the boundaries of legitimate discovery" and "needs to learn to change her behavior" because she had acted "without regard for the rules of professional conduct."

134. The Grievance did not inform the ADO that an experienced, veteran lawyer had falsely accused the "newer" prosecutor of committing prosecutorial misconduct. The Grievance did not inform the ADO that the veteran lawyer had sent written notice to the HCAO, implying that an investigation of the "newer" prosecutor was warranted. The Grievance omitted material adverse information that would have called into question its merits.

D.    **PLAINTIFF'S REPLY AND CROSS-GRIEVANCE**

135. On December 30, 2022, Plaintiff submitted a Reply and Cross-Grievance to the ADO describing salient facts in this Amended Complaint, most of which were duly backed by concrete documentary evidence.

136. The Reply and Cross-Grievance alleged that Attorney Doe committed violations of several Rules of Professional Conduct.  A true and accurate copy of the Reply and Cross-Grievance is attached as Exhibit 11.

137. The Reply and Cross-Grievance alleged that, in connection with the proceedings before the Superior Court, Attorney Doe knowingly and purposefully committed various violations of several Rules of Professional Conduct by committing the following acts:

- Creating a false discovery dispute relating to the State's alleged failure to timely produce the BWC Video Evidence (Rules 3.1, 3.4, and 8.4(c));

- Falsely accusing the State prosecutor of committing prosecutorial misconduct and requesting sanctions against her for the sole purpose of damaging her character and reputation throughout the underlying case and in connection with the Grievance that he filed (Rules 4.4(a) and 8.4(g));

- Knowingly submitting two frivolous motions to compel the production of the BWC Video Evidence after the State had already produced it to him on two prior occasions (Rules 3.1, 3.3, 3.4, and 8.4(c));

- Filing two requests for the imposition of monetary sanctions in connection with the submission of two frivolous motions to compel the production of BWC Video Evidence (Rules 3.1 and 3.4);

- Knowingly including false statements and failing to disclose material information in Superior Court pleadings (Rules 3.1 and 3.3);

- Knowingly making false and misleading statements to the Superior Court at the Dispositional Conference (Rules 3.1, 3.3, and 8.4(c));

- Purposefully failing to correct the record to the Superior Court after it was definitively proven that Attorney Doe had knowingly misrepresented facts to the Superior Court (Rule 3.3); and

- Filing a groundless Grievance against ACA Ben Davie with the sole purpose to harass, delay, burden, and embarrass her, in which he knowingly made numerous misrepresentations and material omissions (Rules 4.1, 3.3, 8.4(g)).

138. The Reply and Cross-Grievance also asserted that Attorney Doe's conduct has (1) harmed the proper administration of the State's overtaxed criminal justice system and (2) wasted limited judicial and state resources.

139. These allegations, many of which were corroborated by documentary proof, provided the ADO with clear and convincing evidence warranting, at a minimum, an ADO inquiry of Attorney Doe's dubious explanation that he found the purported "missing" discovery link in his Deleted Items file of his e-mail just days after the Dispositional Conference. Instead, the ADO took no action on the Reply and Cross-Grievance for six months.

140. During that time period, Attorney Doe filed a brief response to Plaintiff's Reply and Cross-Grievance. Once again, the Response made no reference to (1) Attorney Doe's receipt and downloading of the first discovery link of the BWC Video Evidence on his computer; (2) Attorney

Doe's viewing of the BWC Video Evidence on his computer with his client; (3) why Attorney Doe was untruthful about claiming to "need" a second discovery link because the prior link had "expired" when he already had downloaded the BWC Video Evidence from the first link on his computer; (4) why Attorney Doe sought judicial intervention by filing two frivolous motions to compel and requests for sanctions accusing Plaintiff of depriving his client of access to the video evidence that he already had viewed with his client; and (5) why Attorney Doe did not timely correct his factual misstatements in his Superior Court pleadings and withdraw his motions.

141. On June 21, 2023, ADO General Counsel Moushegian sent a letter to Plaintiff notifying her that the ADO was docketing Attorney Doe's Grievance against her.  No complaint or notice of charges against her was issued at the time.  Although the ADO had decided not to act on Plaintiff's Cross-Grievance against Attorney Doe at that time, it did not disclose this information to her.

142. Finally, at Plaintiff's request, a meeting occurred between Plaintiff, her counsel, and the ADO's Disciplinary Counsel.  At the meeting, Disciplinary Counsel informed Plaintiff that Rule 8.4(g) did not "govern" her alleged conduct.

143. As of September 2024, the ADO had not initiated formal charges against Plaintiff or acted on her Cross-Grievance.  On September 9, 2024, Plaintiff sent the ADO a Resubmitted and Renewed 2022 Grievance Against Attorney Doe and requested a response.  In that submission, Plaintiff also asserted various written and explicit constitutional defenses to the allegations in the Grievance, including her rights to "the laws of equal protection, due process, freedom of speech, separation of powers, and prosecutorial immunity."

144. On December 17, 2024, nearly two years after Plaintiff filed her Cross-Grievance, the ADO sent her a letter stating that it did not intend to take any action on her Cross-Grievance.  The decision erroneously characterized the Cross-Grievance as having been first filed September 9, 2024. It did not refer to whether the ADO had conducted any investigation or convened any evidentiary

hearing before the dismissal. The ADO never disclosed whether or how it ever disposed of the original Cross-Grievance submitted on December 30, 2022.

145. On December 27, 2024, Plaintiff timely filed a Motion for Reconsideration of the decision with the Chair of the Complaint Screening Committee under N.H. Sup. Ct. R. 37A(VI)(a).

146. That same month, the PCC annulled Attorney Doe's 2019 reprimand related to his IOLTA violations.

147. On September 29, 2025, the ADO claimed that on March 21, 2025, it sent a letter to Plaintiff denying her Motion for Reconsideration of the ADO's decision refusing to investigate or discipline Attorney Doe. Plaintiff did not previously receive the letter and first learned of it, despite, upon information and belief, receiving and habitually checking, on a daily basis, USPS informed delivery during that time. Plaintiff first learned of any such alleged letter on September 29, 2025.

### E.    THE DISCIPLINARY PROCEEDINGS WERE INSTITUTED IN "BAD FAITH" TO "HARASS" PLAINTIFF

148. Attorneys facing disciplinary proceedings have procedural due process rights. *In re Ruffalo*, 380 U.S. 544, 550 (1968) (attorney charged with disciplinary violation is entitled to procedural due process, which includes fair notice of the charge, an opportunity to be heard, and the right to present a defense). Disciplinary bar counsel has an obligation to process disciplinary cases in a fair and just manner. *See Fla. Bar v. Rubin,* 362 So. 2d 12, 16 (Fla.1978) ("The Bar has consistently demanded that attorneys turn 'square corners' in the conduct of their affairs. An accused attorney has a right to demand no less of the Bar when it musters its resources to prosecute for attorney misconduct."). *The Fla. Bar v. Kane*, 202 So. 3d 11, 19 (Fla. 2016). While bar counsel has a duty to assure public confidence, bar counsel has a concomitant responsibility to show fairness to the accused attorney. *In re Scholl*, 200 Ariz. 222, 227, 25 P.3d 710, 715 (2001). For instance, bar counsel may not act as an advocate before a disciplinary board and also be present during the disciplinary board's deliberations. *Stigall v. Anchorage Municipality Police & Fire Ret. Bd.*, 718 P.2d 943, 945 (Alaska 1986).

149. In this case, the ADO was obligated to "turn square corners" in its handling of both Attorney Doe's Grievance and Plaintiff's Cross-Grievance. Plaintiff had a right that the ADO assign disciplinary counsel with no conflicts of interest to conduct a fair and dispassionate investigation both of her Cross-Grievance against Attorney Doe as well as his Grievance against her. Since Attorney Doe and Plaintiff's complaints were at odds and the credibility of both grievants was at issue, the ADO had a duty to fairly and impartially examine both complaints.

150. To ensure the fairness and effectiveness of that process, the ADO should have assigned two disciplinary counsel—one to review Attorney Doe's Grievance and the other to examine Plaintiff's Cross-Grievance—and put in place an adequate screening procedure. This simple process would guarantee that the initial evaluation and possible subsequent investigation of each complaint would be performed by a neutral, impartial disciplinary attorney with no conflicts of interest, all of which was necessary to promote the integrity of the investigations and fairness to all parties. *Richard v. Bd. of Prof. Responsibility, Wyoming State Bar*, 547 P.3d 309, 318-319 (Wyo. 2024) (Office of Bar Counsel disqualified where it failed to use proper screening procedures to prevent conflicts of interest of one counsel from being imputed to other lawyers in the office).

151. In this case, the ADO has employed a deeply flawed process to prosecute Plaintiff, demonstrating that this inordinately prolonged state disciplinary proceeding was not instituted in good faith and has resulted in the harassment of Plaintiff for approximately three years.

1. **DISCIPLINARY COUNSEL'S LACK OF NEUTRALITY**

152. The faulty process utilized by the ADO began at the very outset of the matter, and effectively tainted all major aspects of the attorney disciplinary process, including the ADO's investigation of Attorney Doe's Grievance; its failure to investigate Plaintiff's Cross-Grievance for two years; its decision to bring charges against Plaintiff; its failure to bring charges against Attorney Doe, and its biased framing of the charges against Plaintiff.

153. The manner by which the ADO examined the merits of Attorney Doe's Grievance and Plaintiff's Cross-Grievance created conflicts of interest for both the ADO's General Counsel and Disciplinary Counsel assigned to the matter.

154. Since the parties filed cross-grievances arising out of the same events, the merits of each grievance needed to be separately and independently evaluated to determine whether either grievance, both grievances, or no grievance should be docketed. This was especially necessary since each party cast blame on the other and the credibility of each grievant was at issue. Instituting a process where different disciplinary counsel reviewed and examined the grievances separately with appropriate screening procedures in place would have ensured impartial evaluation and avoided conflicts of interest. That, however, did not occur.

155. The ADO was tasked as the initial screener of both grievances. The ADO did not assign separate disciplinary counsel to independently and separately examine the two grievances. As a result, as for both competing grievances, the ADO was required to determine whether there was a "reasonable likelihood that a hearing panel would find clear and convincing evidence that the respondent attorney violated the rules of professional conduct."

156. The ADO, however, did not even treat Plaintiff's Cross-Grievance as a Grievance for approximately two years, even though she filed it on December 30, 2022. Finally, on December 17, 2024, the ADO sent a letter to Plaintiff informing her that it did not intend to take any action on her Cross-Grievance. The ADO erroneously stated that the Cross-Grievance was first filed September 9, 2024. Moreover, it made no reference to whether the ADO had even conducted any investigation of the allegations in the Cross-Grievance.

157. It is reasonable to infer that the ADO was aware that if it had simultaneously proceeded with disciplinary charges against Attorney Doe, that would have directly undermined its filing of charges against Plaintiff.

158. The ADO's decision to investigate and pursue disciplinary proceedings against Plaintiff while simultaneously refrain from evaluating Plaintiff's Cross-Grievance for nearly two years impaired its neutrality and impartiality.

## 2. DEFICIENT INVESTIGATION

159. Plaintiff was entitled to have an impartial ADO attorney conduct a fair and dispassionate investigation to determine whether to proceed with disciplinary charges. Instead, a biased Disciplinary Counsel conducted a deficient investigation of the allegations against her that likely contributed to the permanent loss of critical evidence in the case.[18]

160. The substance of the Notice of Charges indicates the Disciplinary Counsel performed little, if any, "investigation" of the matter as required by N.H. Sup. Court Rule 37(6)(g). The content of the Notice of Charges identified no new facts discovered based on any independent investigation. The documents produced by the ADO in conjunction with its filing of the Notice of Charges consisted almost entirely of the records produced by Plaintiff, even though Plaintiff had made to the ADO three years earlier when she submitted her Cross-Grievance except some emails between Disciplinary Counsel and Plaintiff's counsel, one of which noted that Disciplinary Counsel was unaware that Attorney Doe sent an e-mail to Plaintiff admitting that he had previously watched the BWC Video Evidence with his client before requesting a second copy of the BWC Video Evidence, an updated electronic docket of the arson case, and approximately seven letters Attorney Doe sent to the ADO about Plaintiff—all with copies to Plaintiff—over the three-year period.

161. Notably, the ADO just recently indicated that it does not have—and presumably never has had—the highly controversial e-mail sent by HPD on November 28, 2022, transmitting the second

---

[18] Attorney Doe used a Gmail account. According to a forensic analyst, Gmail maintains a log of the dates on which e-mails were received. However the log is deleted over time and while permanently deleted e-mails can sometimes be recovered, the passage of time diminishes the likelihood of their recovery.

"courtesy" link to Attorney Doe. This document was the centerpiece of the argument at the Dispositional Hearing and is highly relevant to both the merits of the Grievance and the Cross-Claim. The ADO surely should have understood the significance of the e-mail based on the hearing transcript and the parties' cross-grievances.[19]

162. The ADO should have immediately requested Attorney Doe to produce the e-mail. The ADO seems to suggest that it did not request Attorney Doe to produce the e-mail until Plaintiff's counsel asked the ADO to produce the document in October 2025. At that time, the ADO responded that it did not have the document and would request it from Attorney Doe. The ADO later informed counsel that it had requested Attorney Doe to produce the document, and he informed the ADO that he no longer has it.

163. Attorney Doe has evidently destroyed the e-mail even though he was required to preserve evidence in all pending proceedings. This easily could have been avoided had the ADO acted in a timely and competent manner by demanding that Attorney Doe produce and preserve this salient evidence.

164. In addition, the ADO has opposed Plaintiff's recent request to order an independent forensic expert to conduct a comprehensive examination of Attorney Doe's electronic devices, which is what the ADO did in *In the Matter of Nadeau,* No. LD-2002-0009, at *5 (N.H. Apr. 16, 2024)(affirming disbarment of attorney who failed to preserve evidence following receipt of notice of a disciplinary investigation).

165. A forensic examination likely would show (1) whether the HPD's two productions of the BWC Video Evidence are on Attorney Doe's electronic devices; (2) whether the BWC Video Evidence

---

[19] The ADO's understanding of the significance of the e-mail is indicated by the ADO's reference to the e-mail in a proposed Stipulation that it proffered to Plaintiff before she was entitled to discovery. In the Stipulation, the ADO specifically noted the e-mail was "inadvertently deleted" by Attorney Doe and that he allegedly "realized" that after the December 6, 2022 hearing.

were deleted; (3) if they were deleted, the devices from which they were deleted as well as the date(s) and time(s) on which they were deleted; and (4) the terms and parameters that Attorney Doe purportedly used to search for the files, including the dates and times of the searches.

166. Disciplinary Counsel's vigorous opposition to learning this information constitutes further evidence of the ADO's biased approach to this matter, conflict of interest, lack of good faith, and its prolonged, unfair persecution of Plaintiff.

### 3. LACK OF PROPER NOTICE AND UNTIMELINESS OF CHARGES

167. There was also a lack of proper notice of the charges that the ADO filed against Plaintiff. Attorney Doe filed his grievance with the ADO on December 12, 2022.  The Grievance alleged that Plaintiff had violated Rule 8.4(g) on two instances at the Dispositional Conference on December 6, 2022.  It did not cite or even reference Rule 4.4(a).

168. On June 21, 2023, the General Counsel Moushegian notified Plaintiff that the ADO had decided to docket Attorney Doe's Grievance as a complaint rather than generating its own formal complaint.  The docketed complaint was based entirely on Attorney Doe's Grievance alleged that Plaintiff had committed two violations of Rule 8.4(g).

169. On January 25, 2024, a meeting was held between Plaintiff, her prior counsel, and Disciplinary Counsel Greene. Disciplinary Counsel Greene disclosed that Rule 8.4(g) did not govern Plaintiff's conduct. "If anything," Disciplinary Counsel stated, Rule 4.4(a) did.

170. Notably, Rule 8.4(g) requires a purposeful mental state and expressly exempts constitutionally-protected speech. As noted above, Rule 8.4(g) also was promulgated in large part to protect minority female members of the bar from harassment and bullying such as that suffered by Plaintiff at the hands of Attorney Doe.

171. On March 27, 2025, the ADO issued a Notice of Charges alleging that three comments that she made during the Dispositional Conference on December 6, 2022 violated Rule 4.4(a). A true and accurate copy of the Notice of Charges is attached as Exhibit 12.

172. The Notice of Charges alleges that Plaintiff committed three violations of Rule 4.4(a) when she spoke as follows:

- "for the record, he's made an assistant in our office cry in the past" (NOC ¶79)

- "[s]he represented during the Hearing that [the Defense Attorney] had a disciplinary history and was out of compliance in his trust account by $15,000" (NOC ¶80)

- "[s]he asked the Superior Court if it was aware of the circumstances under which [the Defense Attorney] left the Hillsborough County Attorney's Office" (NOC ¶81)

173. Although Disciplinary Counsel previously stated that Rule 8.4(g), which alleges a subjective intent by a lawyer, did not apply to Plaintiff, the Notice of Charges nevertheless allege that Plaintiff made these statements "because she knew, or it was obvious that such action had the primary purpose to embarrass, delay or burden" Attorney Doe, in violation of Rule 4.4(a) (NOC ¶¶79-81).

174. The ADO did not issue the Notice of Charges against Plaintiff until two and a half years after Attorney Doe had submitted his Grievance.  Unlike the docketed Grievance, the Notice of Charges alleged that Plaintiff had violated Rule 4.4(a)—not Rule 8.4(g)—and added a third alleged violation of Rule 4.4(a) that was not included in the docketed complaint. The third alleged violation of Rule 4.4(a), therefore, was never docketed by the ADO. In the ADO's interactions with Plaintiff and her prior counsel, the ADO also did not inquire about the third theory of prosecution.

175. The timing of the ADO's filing of the Notice of Charges against Plaintiff was highly suspect.  On or about April 12, 2024, Plaintiff resigned from the HCAO and assumed a position in the legal department of a large municipality in Massachusetts.  On or about March 10, 2025, the HCAO extended an employment offer for Plaintiff to return to her former position as an Assistant

County Attorney, which Plaintiff accepted.  It was not until after the news that Plaintiff was returning to the HCAO became public that the ADO decided to file the Notice of Charges.

176. The ADO's filing of the Notice of Charges against Plaintiff also was untimely.  New Hampshire Supreme Superior Court Rule 37A(I)(i)(1) provides that "no formal disciplinary proceedings shall be commenced unless a grievance is filed with the attorney discipline office in accordance with section (II)(a) or a complaint is generated and docketed by the attorney discipline office under section (II)(a)(5)(B) of this rule **within two (2) years** after the commission of the alleged misconduct" (emphasis added).  The ADO initiated the disciplinary proceedings against Plaintiff over two and one-half years after the alleged commission of misconduct.

### 4.    THE ADO'S POSITION THAT RULE 4.4(a) IS INAPPLICABLE TO PROSECUTORS

177. The ADO further convoluted the issue of fair notice to Plaintiff from the very beginning of the matter.  On January 25, 2023, the ADO's Disciplinary Counsel assigned to the matter specifically informed Plaintiff that Rule 8.4(g) "did not govern" her conduct and "if any" rule was applicable, it was Rule 4.4(a).

178. Later, on April 12, 2024, ADO General Counsel Moushegian, at a statewide ethics training session conference for the New Hampshire Attorney General's Office, publicly informed and counseled state prosecutors that Rule 4.4(a) did not apply to them as prosecutors.  The session, titled "Training: Attorney Discipline Office: Responding to and Avoiding Grievances," was organized by Assistant Attorney General David Rotman and attended by State prosecutors from various counties, including Plaintiff, and the Attorney General's Office.

179. During the session, General Counsel Moushegian specifically addressed the question whether Rule 4.4(a) and Rule 8.4(g) applied to state prosecutors. He used PowerPoint slides and displayed a slide titled, "Rule 4.4(a) & Rule 8.4(g)." The portion of the slide pertaining to Rule 4.4(a) read as follows:

Ø Rule 4.4(a) (Respect for Rights of Third Persons)

(a)    In *representing a client*, a lawyer shall not take any action if the lawyer **knows or it is obvious** that the action has the **primary purpose** to embarrass, delay or burden a third person (emphasis in original).

180. During the discussion of Rule 4.4(a), General Counsel Moushegian focused on the bolded and italicized language *"representing a client."* He represented to the State prosecutors, including Plaintiff, that they would not encounter this rule because they are not acting on behalf of clients:

> Alright, so, Rule 4.4(a), which is not something that you would encounter as a prosecutor, um, but you may encounter an 8.4(g). So, ah, the difference or distinction in 4.4(a), uh, it, which is "Respect for Rights of Third Person," um, "in *representing a client*," a lawyer shall not take any action if the lawyer knows or it is obvious that the action has the primary purpose to embarrass, delay or burden a third person.
>
> Where 8.4(g) comes in play for prosecutors, is that it can involves "any action, *while acting as a lawyer in any context*, if the lawyer knows or it's [sic] obvious that the action has the primary purpose to embarrass, harass or burden another person," and it goes on to state, um, various sources for or areas where there may be, ah, inappropriate statements so on and so forth.

181. The training session was videotaped. True and accurate copies of the ADO announcement of the training session and the PowerPoint slide titled "Rule 4.4(a) & Rule 8.4(g)" are attached as Exhibit 13.

182. Due to the conflicting and contradictory statements of the ADO—and lack of any formal complaint except for the docketed grievance under Rule 8.4(g)—Plaintiff was forced to speculate for two and a half years about what, if any, charges the ADO might bring against her and to expend substantial resources to prepare a defense to any and all such possibilities.  During that time, Plaintiff informed the ADO's Disciplinary Counsel in writing that her constitutional rights protected her conduct in question to free speech and due process, after which the ADO added the third theory of prosecution with respect to Attorney Doe's having made an HCAO legal assistant cry.

4.    FACTUAL AND LEGAL DEFECTS IN THE NOTICE OF CHARGES

183. Aside from the ADO's position that Rule 4.4(a) is inapplicable, the Notice of Charges contains serious factual flaws that wholly undermine the validity and integrity of the charges.

184. The Notice of Charges' factual defects are sweeping and range from the biased structure of the charging document to broad omissions of pertinent information and flat-out factual inaccuracies. These numerous and varied incurable errors, which pervade the entire document, include the following:

- The ADO's subtle acknowledgement, in Paragraph 72—for the first time in nearly three years—that that the November 28, 2022 email no longer exists, and was never preserved nor examined;

- Substantial modifications as compared against the ADO's proposed Stipulation it proffered to Plaintiff before she was entitled to request or receive discovery from the ADO;

- No clear timeline (statements taken out of context);

- Erroneous facts;

- Omission of material facts, selective and biased presentation of other facts;

- No reference to context where context is important;

- Omission of scores of relevant facts showing rampant unethical acts by the Attorney Doe; and

- A slanted and biased factual presentation designed to rationalize Attorney Doe's misconduct.

185. In the Notice of Charges, the ADO has cherry-picked three of Plaintiff's statements and ignored the context in which they were made. The ADO has taken the biased position that Attorney Doe took at the December 6, 2022 hearing—that his misconduct is irrelevant. The Attorney Doe's conduct is both legally relevant and central to any proper legal analysis of Plaintiff's comments.

186. By presenting the facts in the Notice of Charges in an order that purposefully omits all of Attorney Doe's ethical improprieties, the ADO has intentionally painted a one-sided and wholly inaccurate account of what transpired. This approach to the resolution of a serious charge implicating

an attorney's livelihood and reputation lacks objectivity, lacks good faith, and runs contrary to the Plaintiff's constitutional rights and the interests of justice. *See Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 807 (1987)( "A defendant is entitled to have a 'disinterested prosecutor.'").

187. The Notice of Charges also suffer from legal shortcomings. They fail to consider the evidentiary and procedural rules that governed the admission and relevancy of evidence at the Dispositional Conference. The Notice of Charges further ignores well-established precedent that authorizes a prosecutor to defend against the many attacks on her character and credibility by the Attorney Doe and to exercise her Due Process rights in defending against Attorney Doe's two motions seeking the imposition of sanctions against her.

188. The charges further miscomprehend that Attorney Doe was the central ***witness*** at the hearing. He filed two motions titled "Counsel's Motions" and placed his own credibility in issue. As such, the State had a right to impeach his credibility with evidence of his prior instances of misconduct, prior bad acts, character evidence, and evidence of his routine practices, such as his incompetent handling of sensitive materials over a period of years, to which he admits.

189. In terms of the three comments identified in the Notice of Charges (¶¶79-81), a detailed account of the facts describing the context in which the ACA made these statements is described in Section A.7. All three statements were relevant and material to the credibility, competency, and character of the Attorney Doe, and were made in direct rebuttal to statements that he had made at the Dispositional Conference.

190. One of the most significant factual flaws in the Notice of Charges is the ADO's persistent allegation that the focus of the Dispositional Conference was a genuine "discovery dispute" "between the parties." The ADO references the "discovery dispute" multiple times through the Notice of Charges. *See* Ex. 13 at ¶¶12, 23, 28, 26, 38, 53, 57, 63, 65, and 70. As Plaintiff described several times in corroborated evidence submitted to the ADO, and as is clear from the transcript of the hearing,

there never was a legitimate discovery dispute.  At the hearing, Attorney Doe was forced to concede that he had possession of the discovery link and the BWC Video Evidence.

191. The Notice of Charges omits any reference to and fails to acknowledge the many *ad hominem* attacks contained in Attorney Doe's first and second motions to compel, in which he (1) referred to Plaintiff as a "passive-aggressive obstructionist" who never responded to his request for a replacement link and "lack[ed] [...] professional courtesy"; (2) claimed that Plaintiff treated the arson case as "an aberration for unknown reasons"; and (3) declared that Plaintiff created "just a ridiculous process" for Attorney Doe to obtain four identical copies of the BWC Video Evidence. The Notice of Charges noticeably omits Attorney Doe's statement at the hearing that he would not permit Plaintiff to engage in "juvenile sniping."

192. In keeping with this omission of material information strategy, the Notice of Charges says nothing about Attorney Doe's litany of material misrepresentations and omissions that appeared in his Superior Court pleadings and in statements that he made to the Superior Court and, later, the Supreme Court ADO.

193. Instead, the Notice of Charges *repeats* many of Attorney Doe's misrepresentations. The Notice of Charges say nothing about Attorney Doe's purposeful failure to correct the record and to timely withdraw any of his specious motions, even though he was ethically required to do so.

194. In this vein, the Notice of Charges alleges that when Attorney Doe filed his motions requesting sanctions against Plaintiff, he believed the State had not provided him with a replacement link (Ex. 13 at ¶15). This too was false, as evidenced by Attorney Doe's statement at the hearing that he received a link ***before*** he filed his Second Motion and second request for sanctions. The only link that had been sent to him before he filed the Second Motion was the one HPD sent on November 29, 2022 (excluding the initial link HPD sent on September 29, 2022), which was two days ***before*** he filed his First Motion requesting sanctions.

195. Similarly, the Notice of Charges also omits the material fact that Attorney Doe accessed the State's Objection to the First Motion to compel, which informed him that HPD had sent him two copies of the BWC Video Evidence—one in September, which he downloaded, and one on November 29, 2022, two days before he filed his First Motion.  Attorney Doe accessed the State's Objection well before he filed his Second Motion and second request for sanctions.

196. The Notice of Charges further mischaracterized the Superior Court's familiarity with the Superior Court pleadings at the time of the hearing (Ex. 13 at ¶36).  In response to Plaintiff's request that the Superior Court review the Superior Court pleadings, the Superior Court candidly admitted on the record: "**You're right, I had not looked at these motions before this dispo.**"  At another point early in the hearing, the Superior Court acknowledged that "I don't know that I have looked at them [the Superior Court pleadings] at all."

197. The Superior Court's statements at the hearing make clear that it had no prior familiarity with the Superior Court pleadings until Plaintiff brought them to its attention.  At that time, the Superior Court quickly looked through the documents for less than one minute while the hearing was in progress.  It was only when the presiding judge completed that brief review on the fly in the midst of the hearing that he informed the parties he had "read the papers."

198. The Superior Court's lack of familiarity with the Superior Court pleadings before the hearing was evident. The judge had no prior knowledge that Attorney Doe had filed frivolous back-to-back motions to compel and requests for sanctions, in which he falsely and publicly accused Plaintiff of prosecutorial misconduct, and made public *ad hominem* attacks on her credibility, character, ethics and competency.

199. Similarly, the Notice of Charges asserts that Attorney Doe "immediately" conceded receipt of the link (Ex. 13 at ¶¶39, 51). However, the Notice of Charges omits the full colloquy between the Superior Court and Attorney Doe on this issue, in which he provided evasive non-

responses and, a full thirteen minutes into the approximtaly half-hour long hearing, finally had to concede that he had the BWC Video Evidence. *See* ¶¶51, 58.  Attorney Doe never volunteered this information to the Superior Court and only admitted having received the link when left with no other alternative.  He also never informed the Superior Court during the Dispositional Conference about the State's three other timely productions of BWC Video Evidence to him, making for a total of four timely productions.

200. The Notice of Charges continues this pattern of minimizing and eliminating all references to Attorney Doe's misconduct, including his menacing remarks about terminating his Webex appearance and coming to the Superior Court to "deal with this in person."  Instead, the Notice of Charges sums up Attorney Doe's statements as, "I'm not listening to these accusations" and a simple "offer[]to come down to the Superior Court to address the allegations in person" (Ex. 13 at ¶ 44).

201. Tellingly, the Notice of Charges similarly does not quote but instead mischaracterizes other troublesome and revealing statements made by Attorney Doe during the December 6, 2022 Hearing, despite having possession of an audio recording of the hearing since December of 2022.

202. The combination of the ADO's docketing, investigation, and prosecution of this matter does not resemble what courts would otherwise presume to be a good faith prosecution.

## F.    THE CASE INVOLVES "EXTRAORDINARY CIRCUMSTANCES"

203. This case also presents many extraordinary circumstances.  *First*, it is "extraordinary" that the ADO would fail to investigate the validity of Attorney Doe's claims for three years, make representations to Plaintiff during those three years that falsely suggested they had verified his claims, and only concede the non-existence of material evidence when that very Stipulation the ADO proposed to resolve the case on terms unfavorable to the Plaintiff was rejected by a higher panel, the PCC.

204. *Second,* it is "extraordinary" that the ADO's General Counsel, at the request of the Attorney General's Office, would conduct an ethical training session for State prosecutors, advise State prosecutors **not** to respond to ethical grievances filed against them (contrary to a letter he personally sent Plaintiff on December 15, 2022, which read, "The staff of this Office is in the process of evaluating this grievance to determine if it meets the criteria for docketing…. If you wish to provide us with any information to assist us in that effort, you may do so in writing **on or before January 5, 2023**"), and later permit his office to file a Notice of Charges against Plaintiff in direct retaliation for her response and Cross-Grievance she filed against Attorney Doe.

205. *Third*, it is further "extraordinary" that the ADO would inform Plaintiff that Rule 4.4(a) does not apply to her, and later issue Notice of Charges against Plaintiff predicated solely on alleged violations of Rule 4.4(a) over two years later, after the period of limitations to file that notice of charges expired. Based on reported cases, such conduct by the ADO may be unprecedented.

206. *Fourth*, the ADO's reliance on Rule 4.4(a) in this case is "extraordinary" because it has enabled a criminal defense attorney to manipulate the Attorney Disciplinary System by filing a baseless grievance against a State prosecutor on the heels of his own misconduct, for which he has evaded accountability. This defeats the very purpose of Rule 4.4(a), which aims to prevent attorneys from taking actions to embarrass, burden, and delay others while representing a client. That is precisely what Attorney Doe did to Plaintiff. This is "extraordinary" and runs contrary to the long-recognized principle of the New Hampshire law that "it is not the policy of the law to visit the penalty for violation of laws upon the innocent, and allow the guilty to escape." *Ossipee Hoisery & Woolen Mfg. Co. v. Canney*, 54 N.H. 295, 324 (1874).

207. *Fifth*, it is "extraordinary" that the ADO's misguided initiation of disciplinary charges against a State prosecutor has now provided a template for other defense attorneys and paved the way

for them to gain an unfair advantage in criminal cases by submitting unfounded grievances against prosecutors.

208. *Sixth*, as currently interpreted by the ADO, Rule 4.4(a) prevents State prosecutors from arguing truthful facts to a judge regarding the credibility of a defense attorney/witness, even when the opponent has placed his or her own credibility in issue by making false statements to the Superior Court and by challenging the truthfulness and ethics of a prosecutor.  As a result, defense attorneys are currently incentivized to weaponize Rule 4.4(a) by filing grievances with the ADO against prosecutors who aggressively or forcefully challenge them for engaging in improper conduct during investigations or cases, an "extraordinary" result.

209. *Seventh*, there have been "extraordinary" ramifications of the ADO's imprudent use of disciplinary proceedings, which have already seriously harmed one State prosecutor and have the potential to cause similar harm to prosecutors statewide.

210. The pending investigation sharply curtailed the manner by which Plaintiff handled her cases as an advocate for the State out of her well-founded concern that the ADO would pursue additional charges against her.  In one case, for example, Plaintiff consciously doubted whether she could present evidence regarding a recidivist's offense-related conduct at a sentencing hearing because she feared the ADO would accuse her of "embarrassing" the defendant.  At other times, she has foregone speaking openly and frankly about witness credibility in her cases for fear of offending those around her. Most recently, Plaintiff was uncomfortable discussing a defendant's mental health treatment with the Superior Court due to a concern she was embarrassing the defendant. This chilling of protected speech is the kind of "extraordinary" harm longstanding First Amendment jurisprudence seeks to avoid.

211. The ADO's protracted delay in initiating disciplinary proceedings has caused Plaintiff—a public servant—to personally incur considerable legal fees to defend since New Hampshire will not

indemnify County prosecutors for defense costs.  Plaintiff also has suffered daily emotional distress since she faces the threat of harm to her career and reputation.

212. The ADO's conduct has adversely impaired Plaintiff's ability to perform her responsibilities at a high level and, ultimately, led her to resign from the Hillsborough County Attorney's Office for approximately one year.

213. *Eighth*, the ADO's improvident filing of disciplinary charges to punish a prosecutor's courtroom speech—and, ultimately, to deter a prosecutor from fulfilling her ethical obligation to report attorney misconduct to the ADO—has likely chilled prosecutorial decisions of other Hillsborough County Attorney's Office prosecutors in the Office are aware of the ADO's two and one-half year-long 'investigation' against Plaintiff, during which it requested and produced no documents (except an updated electronic copy of the arson docket), and interviewed Plaintiff once *at Plaintiff's request*.

214. *Ninth*, there is now a distinct likelihood that other State prosecutors will be the subject of grievances filed by defense attorneys, given the ADO's interpretation and application of an overbroad professional conduct rule.  They too could incur large financial costs defending bogus grievances given the State's indemnification stance.

215. *Tenth*, the ADO's poor judgment in using Rule 4.4(a) as a test case against a State prosecutor in this fashion will likely have the deleterious effect of causing some current State prosecutors to resign and deterring other talented attorneys from joining State County prosecutors' offices, most of which already are understaffed and overburdened with large caseloads.

216. *Eleventh*, the case is extraordinary because the ADO is vigorously attempting to prevent Plaintiff from fairly litigating her constitutional rights, claims, and defenses in every forum. Although Plaintiff has interposed her constitutional rights in her Answer to the Notice of Charges, the ADO has filed a motion in the state disciplinary proceeding to preclude her from presenting evidence as to

the rights and defenses.  Simultaneously, the ADO has filed a motion to dismiss this case based on the *Younger* abstention doctrine, arguing that Plaintiff has an adequate state forum to pursue her constitutional claims asserted in this case.

217. The rules governing the attorney disciplinary system further do not provide the ADO, Hearings Committee, or PCC with the power or authority to rule that a Rule of Professional Conduct issued by the New Hampshire Supreme Court violates either the United States Constitution, the New Hampshire Constitution, or both.  The Superior Court similarly cannot declare a Rule of Professional Conduct to be unconstitutional.  Finally, in September 2025, the New Hampshire Supreme Court declined to hear the Plaintiff's constitutional challenge to Rule 4.4(a) following her expenditure of significant resources and time requesting it exercise its original jurisdiction to hear such a claim.

218. The rules governing the administration of the Attorney Discipline System preclude Plaintiff from filing a Motion to Dismiss her case at any time and on any grounds; and for two-and-a-half years the same rules precluded Plaintiff from taking or receiving discovery in the ADO proceedings.[20]

219. The case is "extraordinary" for a multitude of reasons, and Plaintiff can only fairly adjudicate her claims in Federal Court.

## G.    NEW HAMPSHIRE RULE OF PROFESSIONAL CONDUCT 4.4(a)

220. The applicable Rule in this case is N.H R. Prof. Conduct 4.4(a).  Rule 4.4(a) is based on a significantly modified version of Model Rule 4.4(a) of the American Bar Association's "Model Rules of Professional Conduct."

---

[20] The rules authorize Disciplinary Counsel to file a motion to dismiss, and authorize the PCC to hear motions by Disciplinary Counsel to dismiss grievances and complaints (but not Notices of Charges).  Similarly, the rules do not authorize a respondent attorney to take or receive discovery unless and until the Disciplinary Counsel files a formal notice of charges (although Disciplinary Counsel may take and receive discovery during that time), which did not occur in this case until nearly two-and-a-half years after Attorney Doe filed his Grievance.

221. ABA Model Rule 4.4(a) prohibits lawyers from using "means that have **no substantial purpose other than** to embarrass, delay, or burden a third person, or use methods of obtaining evidence that violate the legal rights of such a person" (emphasis supplied).

222. With the exception of New Hampshire, the version of ABA Model Rule 4.4(a) in effect in every other state in our Nation and the District of Columbia adopts the **"no substantial purpose other than"** language from ABA Model Rule 4.4(a).

223. The "no substantial purpose other than" language of ABA Model Rule 4.4(a) requires state bar disciplinary authorities to rule out *all* other "substantial" purposes for lawyer speech before censoring that speech. Forty-six (46) states also define the term "substantial."

224. In contrast, New Hampshire's version of Rule 4.4(a), uses a far broader **"primary purpose to"** standard. N.H. R. Prof. Conduct 4.4(a) provides that: "In representing a client, a lawyer shall not take any action if the lawyer knows or it is obvious that the action has the **primary purpose to** embarrass, delay or burden a third person" (emphasis added).

225. By employing different standards to identify prohibited speech, there is a vast difference between what constitutes permissible speech by attorneys in forty-nine (49) states and the District of Columbia, and what constitutes permissible speech by attorneys licensed in New Hampshire.

226. New Hampshire's minority version of Rule 4.4(a) is an aberration and an outlier. The rule is overinclusive because it focuses solely on an attorney's "primary" purpose for engaging in conduct to the exclusion of all other purposes, even "substantial" purposes that expressly authorize, permit, or even require the attorney to have engaged in the conduct in question. From the ADO's standpoint, a "substantial purpose" that justified the attorney's conduct in question is wholly irrelevant if the ADO subjectively determines that the "primary" purpose of the attorney's speech was to embarrass, delay, or burden another. As a result, New Hampshire is the only jurisdiction in the country where an attorney can be found to have violated a disciplinary rule even though he or she had a

legitimate, "substantial purpose" for his or her conduct or speech other than to embarrass, burden, or delay another person.

227. It erroneously assumes that speech necessarily has a so-called "primary" purpose.  It is also the only jurisdiction where speech made with *one or more* "substantial" purposes is nevertheless censored if the ADO, the Complaint Screening Committee, Hearings Committee, or Professional Conduct Committee decides that its so-called "primary" purpose is a prohibited one.

228. A key flaw with New Hampshire Rule 4.4(a) is that its reliance on the **"primary purpose"** standard reaches too much protected speech.  There are countless scenarios and circumstances in which an attorney can have multiple permissible purposes or reasons to engage in conduct or speech even though the attorney knows that his or her conduct or speech will embarrass, delay, or burden another person.

229. Rule 4.4(a)'s overbreadth causes the rule to collide with a host of rules of evidence that specifically authorize, and indeed require, courts to admit evidence at trials and at hearings that, by definition, are designed to embarrass and burden witnesses.

230. Rule 4.4(a)'s overbreadth also causes it to unnecessarily create a serious ethical dilemma for New Hampshire attorneys.  On one hand, N.H. Rule Prof. Conduct 1.3, requires lawyers to "act with reasonable diligence and promptness in representing a client." As explained by the ABA Model Code Comment cited by Rule 1.3, lawyers must "act with commitment and dedication" to their clients' interests, "and with zeal in advocacy upon the client's behalf."  The ABA Comment further counsels that a lawyer should "take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor."  On the other hand, Rule 4.4(a), prohibits attorneys from engaging in actions that have a "primary purpose" of embarrassing a third person.

231. The Rule provides no guidance on how to balance Rule 4.4(a) against speech a lawyer is required to make to satisfy other ethical obligations.

232. These pronounced defects of Rule 4.4(a) are particularly troubling when applied to professionals whose duty is to discredit opposing parties and witnesses in an adversarial setting as a matter of routine. Or when a Superior Court judge who did not read the pleadings instructs a lawyer to disregard their higher mandate from the State's Supreme Court to not permit a fraud to be perpetrated on the court.

233. The rule's overbreadth similarly applies to its terms "delay" and "burden" of another person, as there are numerous scenarios in which counsel is authorized to "delay" and "burden" others. For example, the rules of civil procedure authorize the counsel to seek injunctive relief against other persons in situations where the other person's conduct can or is causing harm. In this scenario, counsel seeking a request for a temporary restraining order, a preliminary injunction, or simply injunctive relief risks running afoul of Rule 4.4(a)'s all-inclusive proscriptions.

234. New Hampshire's Rule 4.4(a) is also vague because it fails to define or provide guidelines for the meaning of "primary," a word with myriad connotations and meanings. The first definition of the word "primary" in Webster's Third New International Dictionary Unabridged, Kindle Edition, is "something that stands first in order, rank, or importance."[21]

235. The rule's definitional terms necessarily are based on subjective, and therefore arbitrary, values and beliefs. Upon hearing the same speech, people may have different so-called "primary" reactions depending on their own subjective values and beliefs. Rule 4.4(a)'s addition of the word "obvious" does not clarify its ambiguity. Often, no single viewpoint is "obviously" right. One's

---

[21] Another source, the Oxford English Dictionary, provides that "[t]here are 49 meanings listed in [Oxford English Dictionary's] entry for the word *primary*, one of which is labelled obsolete" (emphases in original). First, in the "[g]eneral sense[]," the Oxford English Dictionary defines "primary" as "[o]ccurring or existing first in a sequence of events; belonging to the beginning or earliest stage of something; first in time." Second under the "general sense" category of definitions, "primary" is defined as "[o]f the highest rank or importance; principal, chief." Third, in the "general sense," the term "primary" is defined as "not subordinate to or derived from anything else; that is the source or cause of something; fundamental; original." Fourth, in the "general sense," "primary" is defined as "[n]ot involving intermediate agency; immediate, first-hand; that is a direct result of something. Now chiefly in technical and specialist senses: cf. A.II."

primary perceptions of speech or conduct often will necessarily contradict the primary perceptions of other reasonable minds, depending upon their subjective beliefs and values. Speech or conduct that is "primarily" and "obviously" acceptable to a large population often is offensive and embarrassing to others.

236. In an apparent recognition of this defect, at a public meeting of the New Hampshire Supreme Superior Court Committee on Rules, on September 10, 2021, one lawyer attested that he was working with the ADO to draft a proposed amendment that would define the meaning of "primary purpose." That amendment was never adopted.

237. Instead, "primary purpose" continues to proscribe conduct committed with a legitimate, proper, or material purpose. As long as laypeople comprising a hearings panel designated by its Chair determine that, in their subjective view, the "*primary purpose*" of a lawyer's speech or conduct was to embarrass, delay, or burden a third person, then that panel hypothetically might find that the lawyer's speech violated Rule 4.4(a).

238. Rule 4.4(a) also makes no provision for a hearings panel's consideration of First Amendment principles,[22] nor does it explain how to apply due process principles for a lawyer whose speech occurred in the context of a hearing on motions for sanctions against that lawyer.

239. The Rule does not define whose view governs in deciding the "primary purpose" of otherwise constitutionally-protected speech. It provides no guidance on how to balance Rule 4.4(a) against speech a lawyer is required to make to satisfy other ethical obligations. The Rule further fails to define or provide examples of "embarrassing" or "burdening" speech, or speech made with the "primary purpose" to delay.

---

[22] N.H. R. Prof. Conduct 8.4(g) specifically does reference constitutionally protected speech. Rule 8.4(g) provides, in pertinent part, that it does not "preclude a lawyer from engaging in conduct or speech or from maintaining associations that are constitutionally protected…." Rule 8.4(g) contains language that is a near-mirror image of the language in Rule 4.4(a), in that it proscribes action "if the lawyer knows or it is obvious that the action has the primary purpose to embarrass, harass or burden another person." On January 25, 2024, the ADO stated Rule 8.4(g) did not govern Plaintiff's conduct.

240. The Rule additionally does not address the applicability of the doctrine of collateral estoppel in cases where a state or federal court denies an attorney's motion for sanctions based on the claim that opposing counsel acted "obstructively," for the purpose of delay, embarrassment, or burdening, as in this case.

## LEGAL CLAIMS

## COUNT I

### Violation of First Amendment to the U.S. Constitution

241. Plaintiff repeats and incorporates by reference the above allegations.

242. At all relevant times, the Defendants acted under the color of state law within the meaning of 42 U.S.C. § 1983, in their administration, implementation, and enforcement of N.H. R. Prof. Conduct 4.4(a).

243. According to the First Amendment to the U.S. Constitution, "Congress shall make no law … abridging the freedom of speech." The First Amendment has been incorporated to apply to the states through the Fourteenth Amendment.

244. Plaintiff's speech at the Disposition Conference of December 6, 2022, including all statements identified by the ADO in the Notice of Charge, is fully protected by the First Amendment.

245. N.H. R. Prof. Conduct 4.4(a) chills such speech and, based on the content and viewpoint of the speech, imposes professional liability in contravention of the First Amendment.

246. Furthermore, N.H. R. Prof. Conduct 4.4(a) permits the state to sanction speech based on an entirely objective standard, with no accompanying subjective *mens rea*, contrary to the United States Supreme Court's holding in *Counterman v. Colorado*, 600 U.S. 66 (2023).

247. Rule 4.4(a) is substantially overbroad in relation to any legitimate application and is facially unconstitutional for that reason.

248. On its face and as applied to Plaintiff's speech, Rule 4.4(a) violates the right to free speech guaranteed by the First Amendment as it is overbroad and has a substantial chilling effect on speech.

## COUNT II

### Violation of the Due Process Clause, Fourteenth Amendment to the U.S. Constitution (Void for Vagueness)

249. Plaintiff repeats and incorporates by reference the above allegations.

250. The Fourteenth Amendment provides in relevant part that "… nor shall any State deprive any person of life, liberty, or property, without due process of law."

251. Disciplinary enforcement proceedings deprive the Plaintiff of liberty and property.

252. Due Process requires that people of common intelligence be able to understand what conduct a given rule prohibits.

253. Rules, statutes, or policies that fail to provide fair notice are void for vagueness.

254. Rules, statutes, or policies that authorize and even encourage arbitrary and discriminatory enforcement are void for vagueness.

255. Rules, statutes, or policies that implicate and jeopardize First Amendment rights must be especially precise. People of ordinary intelligence cannot understand what Rule 4.4(a) prohibits.

256. The Plaintiff cannot understand what Rule 4.4(a) prohibits.

257. Rule 4.4(a) does not provide fair notice of what it prohibits.

258. Rule 4.4(a) authorizes and encourages arbitrary and discriminatory enforcement.

259. Rule 4.4(a) chills First Amendment-protected speech and requires a more stringent review for vagueness.

260. Rule 4.4(a) use of the phrase "if it is obvious that the action that has the primary purpose to embarrass, delay, or burden" is unconstitutionally vague.

261. Rule 4.4(a) violates the Due Process Clause of the Fourteenth Amendment and is void for vagueness.

262. The vagueness of Rule 4.4(a) chills protected speech and thereby also violates the First Amendment.

263. On its face and as applied to Plaintiff's speech, Rule 4.4(a) violates the Due Process Clause of the Fourteenth Amendment as it is void for vagueness and overbroad.

## COUNT III

### Violation of the Fourteenth Amendment to the U.S. Constitution
### (Procedural Due Process)

264. Plaintiff repeats and incorporates by reference the above allegations.

265. Attorneys facing disciplinary proceedings have procedural due process rights, including the right to fair notice of the disciplinary charge filed against them.

266. An attorney's due process rights may be violated when a state bar disciplinary official amends the charges against the attorney at the disciplinary hearing or at a time so late that it denies the attorney a meaningful opportunity to prepare to respond to the charges.

267. The ADO abridged Plaintiff's procedural due process rights of fair, adequate, and timely notice of the charges due to its (1) convoluted and conflicting statements about the non-applicability of disciplinary rule on which the charges are based; (2) untimely filing of the Notice of Charges; (3) addition of a new theory of prosecution immediately after news became public that Plaintiff was returning to the HCAO; and (4) addition of the new theory of prosecution following Plaintiff's assertion of her constitutional rights.

268. Plaintiff's procedural due process rights also were violated because the Disciplinary Counsel and General Counsel pursuing charges had conflicts of interest against Plaintiff and were not impartial decision-makers from the outset of the matter to the present.  Their bias pervaded and

tainted every aspect of the case including their failure to investigate Plaintiff's initial Cross-Grievance, their deficient investigation, and their issuance of factually and legally flawed Notice of Charges.

269. The Notice of Charges refuses to acknowledge wrongdoing by Attorney Doe. It also omits material facts, alleges facts out of context, assumes facts based on credibility determinations of Attorney Doe that are at odds with the weight of undisputed evidence, and alleges facts that are not substantiated by the record.

270. The process employed by the ADO to prosecute this matter has violated Plaintiff's procedural due process right to have a fair and dispassionate investigation, fair notice of any charges, the timely filing of charges, a fair opportunity to be heard, and a neutral and detached decision-maker.

## **PRAYER FOR RELIEF**

WHEREFORE, the Plaintiff respectfully requests the following relief:

1. Enter a declaratory judgment that N.H. R. Prof. Conduct 4.4(a) facially violates the Due Process Clause of the Fourteenth Amendment and First Amendment of the United States Constitution.

2. Enter a declaratory judgment that N.H. R. Prof. Conduct 4.4(a), as applied to Plaintiff, violates the Due Process Clause of the Fourteenth Amendment and First Amendment of the United States Constitution.

3. Enter a declaratory judgment that the ADO's long-standing application and interpretation of Rule 4.4(a) constitutes an administrative gloss that cannot be set aside without an amendment of the rule by the Supreme Court.

4. Issue preliminary and permanent injunctions prohibiting the Defendants from investigating, enforcing, and administering the enforcement of N.H. R. Prof. Conduct 4.4(a) against

Plaintiff in the disciplinary matter entitled *Brander, Elena M. (Ben David, Elena M.) advs. Attorney Discipline Office*, No. 23-013, and any other future matter based on the same facts and events.

    5.    Enter an order directing ADO General Counsel Moushegian to remove Attorney Doe's Grievance against Plaintiff from the docket and to annul the record associated with its receipt and subsequent investigation and docketing.

    6.    Any additional relief this Court deems just and proper.

## JURY DEMAND

    Pursuant to Fed. R. Civ. P. 28, the Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,
Elena Brander
By her Attorneys,

LEHMANN MAJOR LIST, PLLC

*/s/ Richard J. Lehmann*
Richard J. Lehmann (Bar No. 9339)
6 Garvins Falls Road
Concord, N.H. 03301
(603) 715-2516
rick@nhlawyer.com

CLEVELAND, WATERS AND BASS, P.A.

*/s/ Jacob M. Rhodes*
Jacob Rhodes (Bar No. 274590)
Two Capital Plaza, 5th Floor
Concord, N.H. 03301
(603) 224-7761
rhodesj@cwbpa.com

-AND-

CAMPBELL CONROY & O'NEIL, P.C.

Thomas C. Frongillo (BBO No. 180690)
(*Pro Hac Vice Forthcoming*)
20 City Square, Suite 300
Boston, MA 02129-3733
(617) 241-3000
tfrongillo@campbell-trial-lawyers.com

DATE:  February 3, 2026                    *Attorneys for Plaintiff Elena Ben David*

## CERTIFICATE OF SERVICE

I hereby certify that an electronic copy of the within document was served upon all counsel of record through the court's ecf-filing system.

February 3, 2026                    */s/ Jacob M. Rhodes*
                                    Jacob M. Rhodes, Esq.

## VERIFICATION

Pursuant to 28 U.S.C. § 1746, I, Elena Ben David have personal knowledge of the factual matters alleged in this Verified Complaint concerning myself, my activities and my intentions.  I verify under the penalty of perjury that the factual statements made herein are true and correct.

Executed on December 10, 2025                    */s/ Elena Ben David*
                                    Elena Ben David

4926-8476-4800, v. 3